Curtis L. DEMBY, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

No. 162, 1998.

Supreme Court of Delaware.

Submitted: Sept. 8, 1999.
Decided: Jan. 10, 2000.

Joseph M. Bernstein, (argued) and Joseph A. Gabay, Wilmington, Delaware, for appellant.

Kim Ayvazian, (argued) and William E. Molchen, Department of Justice, Georgetown, Delaware for appellee.

Before VEASEY, Chief Justice, HOLLAND and BERGER, Justices.

HOLLAND, Justice:

The defendant-appellant, Curtis L. Demby, was indicted for the crimes · of Murder in the First Degree and Possession of a Firearm During the Commission of a Felony ("PFDCF"). Following a 1998 jury trial in the Superior Court, Demby

was found guilty as charged.[1] This was Demby's second trial on these charges. Demby's convictions in his first trial were reversed on appeal.[2] The case was remanded for a new trial.[3]

The sole issue raised by Demby in this second direct appeal is that the Superior Court committed reversible error by refusing to give a missing witness instruction when the jury knew that the witness was incarcerated. The State has filed a cross-appeal[4] that alleges the Superior Court erred in instructing the jury on lesser-included offenses. We have concluded that both of the Superior Court's rulings were correct.

### State's Evidence

On December 19, 1994, an individual shot and killed 14 year-old Howard Brown. Shortly before the shooting, Demby was arguing with Brown on 27th street in Wilmington. Demby left the scene but soon returned with Freddy Flonnory. Brown and Demby began arguing again. Brown challenged Demby to a fist fight.

Flonnory pulled out a gun, but Demby convinced Flonnory to leave with him. As he left, Demby allegedly told Brown, "When I come back, I'll be busting [i.e., shooting]."

Twenty minutes later, Brown and some friends were watching a dog fight near the area of 27th and Bowers Streets. Suddenly, Demby came out from between two houses and started firing a gun at Brown. Demby wore a black hooded leather jacket, black jeans, and black boots.

One of Brown's friends testified he was "positive" the shooter was Demby. Two other eyewitness also stated that Demby was the shooter. Several other people saw a person dressed in black clothing shoot Brown, run into an alley, and then drive away in a black car.

After the shooting, Flonnory and Demby drove to Philadelphia where Demby called his mother's house. Demby later told his girlfriend's mother, Cheryl Berry, that he did something wrong. A police detective testified that Demby admitted that he lied numerous times, including when he denied being at the scene of the shooting.

### Demby's Defense

Demby testified that he argued with Brown but did not wish to fight with him because Brown was too small. Flonnory joined the altercation and pulled a gun. Demby calmed Flonnory down and dragged him away. Demby denied saying that he was "going to come back busting."

According to Demby, after the initial skirmish, Demby drove to Riverside Park with Flonnory, his brother, and a friend to sell drugs. Demby testified that he returned unarmed and unmasked, walked through the alley and encountered Brown. Just as Demby started to speak to Brown, Flonnory appeared, wearing a ski mask, and shot Brown. Demby and Flonnory drove to Philadelphia, where Demby called his mother. Demby learned that Brown was going to die and that people said he did the shooting. Demby's girlfriend and his brother picked him up in Philadelphia and drove him home to Delaware.

At trial, Demby called Michael Lehman as a witness to corroborate Demby's story that Flonnory admitted shooting Brown. Outside the presence of the jury, Lehman testified that he and Flonnory escaped from Ferris School weeks after the shooting. Lehman refused to answer any other questions, including those about conversations he had with Flonnory after they escaped. The trial judge held Lehman in

---

1. Demby was sentenced to life in prison for the murder conviction and to an additional term of 20 years for the weapon's offense.

2. *See Demby v. State,* Del.Supr., 695 A.2d 1152 (1997).

3. *Id.*

4. 10 *Del. C.* § 9902(e).

contempt and sentenced him to 30 days in jail. Demby then called Detective Mark Williams, who was in charge of investigating the escape from Ferris School. Williams testified he had a conversation with Lehman shortly after Lehman was captured and that they discussed Flonnory's problems with the law. Williams also stated that he had a conversation with Lehman weeks after the escape. The jury then viewed that second videotaped interview in which Lehman stated that Flonnory told him that he (Flonnory) shot Brown and then threw the gun in the Brandywine River.

On cross-examination, the State attempted to show that Lehman's first statement to Detective Williams differed markedly from the videotaped statement that implicated Flonnory. The State also attempted to show that Lehman's motivation in implicating Flonnory was to extricate himself from a lengthy prison sentence. Detective Williams testified that Lehman was in prison when Williams interviewed him, and remained imprisoned on the date of Demby's trial.

After a recess, Demby argued that because of the State's questioning and Williams' answer, the jury now knew that Lehman was incarcerated and might speculate why Demby did not call Lehman as a witness. Demby requested the trial judge to instruct the jury that Lehman was "unavailable" to either side and that they should not speculate as to what his testimony might have been had he testified in person. The trial judge refused to give the instruction, reasoning that just because the jury knew Lehman was incarcerated did not mean that they would draw a negative inference because Demby did not call Lehman to testify at trial.

### Missing Witness Instruction

Demby argues the Superior Court erred in refusing to instruct the jury that Leh-

man was unavailable for either Demby or the State to call as a witness. Demby contends that "there is no conceivable prejudice that might have accrued to the State if such an instruction had been given." Conversely, Demby submits the potential for prejudice to the defense was significant. According to Demby, Lehman's out-of-court statement that Flonnory was the shooter was the centerpiece of his defense. Demby argues that if the jury was not told Lehman was unavailable, it was likely to draw a "missing witness" inference against the defendant, "i.e., that the defense did not want to call Lehman because they were afraid that his testimony would hurt the defense case, and therefore disregard Lehman's [videotaped] out-of-court statement."

The general purpose of the missing witness instruction is to avoid a situation where: "if a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates a presumption that the testimony, if produced, would be unfavorable." [5] "A missing witness inference is permissible only where it would be 'natural' for the party to produce the witness if his testimony would be favorable." [6] In *Wheatley v. State*, this Court noted:

> ... Like all sound inferences, the missing witness inference is rooted in notions of common sense, specifically that where a party fails to call an available witness with important and relevant knowledge, it may be that he has something to fear in the witness' testimony. The strength of the inference will, of course, vary with the facts of each case, depending on how natural it would be for the party to have called the witness but for some apprehension over his testimony.... [7]

---

5. *Graves v. United States*, 150 U.S. 118, 121, 14 S.Ct. 40, 37 L.Ed. 1021 (1893).

6. *Wheatley v. State*, Del.Supr., 465 A.2d 1110, 1111 (1983).

7. *Id.*, quoting *United States v. Tucker*, 7th Cir., 552 F.2d 202, 210 (1977).

In *Wheatley*, we also stated: "[I]t is plain that the inference is based, not on the bare fact that a particular person is not produced as a witness, but on his non-production when it would be natural for him to produce the witness if the facts known by him had been favorable."[8]

It was not "natural" for either Demby or the State to produce Lehman in court.[9] Demby argues that the "cornerstone" of his defense was to show that Flonnory admitted shooting Brown. Demby accomplished this by introducing Lehman's videotaped statement into evidence. Conversely, since Lehman's first statement to Detective Williams was favorable to the State, the State also established that point without calling Lehman.

█ Thus, it is unlikely that the jury would speculate why Lehman did not testify and draw an unfavorable inference that was adverse to either Demby or the State by Lehman's absence. Moreover, it would be "common sense" for an average juror to conclude that Lehman was completely unavailable to testify *because* he was incarcerated. Accordingly, we hold the Superior Court properly exercised its discretion in denying Demby's request to instruct the jury that Lehman was unavailable to either the prosecution or the defense.[10]

### Accomplice Liability
### Lesser–Included Offenses

In its cross-appeal, the State argues that the Superior Court erred in instructing the jurors that they could find Demby guilty of one of the lesser degrees of homicide under 11 *Del. C.* § 274. That section provides:

8.  *Wheatley v. State*, Del.Supr., 465 A.2d 1110 (1983) *quoting* Wigmore *Evidence on Trials at Common Law* § 286 at p. 199 (Chadbourn rev.1979).

9.  *See Wheatley v. State*, 465 A.2d at 1111.

10.  *See United States v. Brutzman*, 9th Cir., 731 F.2d 1449, 1454 (1984) (court's refusal to give missing witness instruction not erroneous where witness pleaded the Fifth).

*Offenses involving 2 or more persons; convictions for different degrees of offense.*

When, pursuant to Section 271 of this title, 2 or more persons are criminally liable for an offense which is divided into degrees, each person is guilty of an offense of such degree as is compatible with that person's own culpable mental state and with that person's own accountability for an aggravating fact or circumstance.[11]

Section 271 provides: "A person is guilty of an offense committed by another when ... [i]ntending to promote or facilitate the commission of the offense the person...."[12]

The State argues that Section 274 is inapplicable unless there is evidence in the record that the crime committed by the principal might not be intentional murder, but some "lesser included" offense. In support of its argument, the State cites Section 206(c), which provides:

The court is not obligated to charge the jury with respect to an included offense unless there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting the defendant of the included offense.[13]

The State's argument fails to read Section 274 and Section 271 *in pari materia.*

In *Chance*, this Court determined that because Section 274 incorporates Section 271 by reference, the use of the word "offense" in Section 271 and the use of that same word in Section 274 must be construed *in pari materia.*[14] In *Chancè v. State*, as in Demby's case, the defendant was charged with Murder in the First

11.  11 *Del. C.* § 274

12.  11 *Del. C.* § 271 (emphasis added).

13.  11 *Del. C.* § 206(c).

14.  *Chance v. State*, Del.Supr., 685 A.2d 351, 357 (1996).

Degree. In *Chance*, this Court concluded that the use of the word "offense" in Section 271 and Section 274 is reconciled by construing it to mean "homicide."[15]

Accordingly, in *Chance* we held, as a matter of Delaware law, the jury was required to distinguish between an accomplice's liability for the offense of homicide and that accomplice's culpability for the degree of homicide, i.e., the crime of Murder in the Second Degree, Manslaughter or Criminally Negligent Homicide.[16] In Demby's case, as in *Chance*, the latter determination was dependent upon the jury's assessment of Demby's own culpable mental state while acting as an accomplice, without regard to another participant's guilt for a different degree of homicide.[17] The jury could discharge that statutory mandate in Section 274 only if it was instructed with regard to the lesser-included offenses of Murder in the First Degree.[18]

 The Superior Court concluded that there was a factual basis in the record to instruct the jury that Demby could be convicted on the Section 271 theory of accomplice liability. Because Demby was charged with an "offense which is divided into degrees," Section 274 directed the jury to find Demby "guilty of an offense of such degree as is compatible with that person's own mental state." The Superior Court properly concluded that this Court's holding in *Chance* required it to instruct the jury in Demby's case with regard to the lesser-included degrees of homicide.

## Conclusion

The Superior Court's judgments of conviction are affirmed.

---

15. *Id.* at 359.

16. *Id.*

17. *Id. See* 11 *Del. C.* § 274.

18. *See Chance v. State*, 685 A.2d at 357 ("even though A is liable for the offense of homicide that results from an agreement to aid B in an unlawful assault, the degree of homicide offense for which A and B are guilty depends upon their own respective 'culpable mental states'").