Juan ORTIZ, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Nos. 494,2003, 528,2003.

Supreme Court of Delaware.

Submitted: Oct. 6, 2004.
Decided: Jan. 25, 2005.

Lloyd A. Schmid, Jr., Esquire, Assistant Public Defender, Dover, Delaware, for appellant.

Kim Ayvazian, Esquire (argued) and John Williams, Esquire, Department of Justice, Georgetown, Delaware, for appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and HARTNETT,[1] Justices (constituting the Court en Banc).

HOLLAND, Justice.

This is the defendant-appellant's, Juan Ortiz, consolidated direct and automatic appeals from his judgments of conviction and death sentence for the murder of Deborah Clay. A Superior Court jury convicted Ortiz of Murder in the First Degree, Possession of a Firearm During the Commission of a Felony and Arson in the Second Degree. Following a penalty hearing, the jury voted eleven to one to recommend a sentence of death. The trial judge sentenced Ortiz to death.

Ortiz has raised six issues on appeal. First, he contends that the failure of the trial judge to inquire into ordinary attitudes, or potential biases or prejudices of potential jurors on issues not directly related to the facts of the case or on the question of the death penalty, unconstitutionally limited his ability to meaningfully exercise his right to challenge prospective jurors. Second, Ortiz alleges that the repetitive display to the jury of the victim's nearly decapitating head wound, by various means and at various times throughout the trial, was a calculated effort on the part of the State to impermissibly inflame the passion of the jury. Third, Ortiz submits that equivocal and irrelevant evidence regarding alleged prior bad acts was admitted in rebuttal at the penalty hearing without appropriate review with no prior notice, in the mistaken view that it addressed aspects of the defense's case in mitigation. Fourth, Ortiz claims that the denial of his motion for a new penalty hearing was an abuse of discretion. Fifth, Ortiz argues that his death sentence violates his constitutional right to a jury determination by proof beyond a reasonable doubt of all facts upon which the enhanced sentence of death was predicated. Sixth, Ortiz submits that his death sentence is disproportionate to sentences imposed in similar cases.

We have reviewed the record and considered Ortiz's claims of reversible error. We have determined that the trial judge properly exercised his discretion: in conducting the *voir dire* of prospective jurors; in ruling on the evidentiary issues related to the State's photographic exhibits; in permitting the State to present rebuttal evidence of Ortiz's prior bad acts; and in denying Ortiz's motion for a new penalty hearing. We also hold that the Delaware death penalty statute, as applied to Ortiz, is constitutional. Finally, we have concluded that the imposition of Ortiz's death sentence is proportionate to sentences imposed in similar cases. Accordingly, the Superior Court's judgments of conviction and the imposition of Ortiz's death sentence are affirmed.

---

1. Sitting by designation pursuant to Del. Const. art. IV, § 38 and Del.Code Ann. tit. 29, § 5610(a)(2) (2001) and Del.Supr. Ct. R. 2 & 4.

## Facts

Deborah Clay entered into a romantic relationship with Ortiz in 2001. Deborah was forty-one years old in July of that year. In March 2001, Ortiz moved into Deborah's home. At that time, Deborah's fifteen-year-old daughter, Ashley, was living with Deborah.

Ortiz stayed with Deborah and Ashley from March 19, 2001 to May 29, 2001. During that time, Ortiz was under home confinement by the Delaware Department of Corrections. His monitoring device was located in the back bedroom of Deborah's home. Ortiz left for a few months and returned to Deborah's home on June 26, 2001. On July 4, Ashley heard Deborah tell Ortiz he had to move out of her home by that Sunday.

The next evening, July 5, Ashley tried to open the door to her mother's bedroom, but the door was locked. Ortiz was in that bedroom. When he unlocked the door, Ashley noticed Deborah's waterbed was deflated. Ortiz was upset and crying. He told Ashley that he tried to shoot himself but missed and shot the waterbed. Ortiz said that he was going to have Deborah take him to a mental institution.

Later that night, around 11:00 p.m., when Ashley returned home, Ortiz appeared normal. Ashley then called her mother to ask permission to go out with her friends. Deborah did not want Ashley to go out because Deborah feared being alone with Ortiz at her home. Deborah also requested Ashley to tell Ortiz that "he still had to be out by Sunday."

Deborah's son, Brock Prichett, who was twenty-seven years old, owned a 6mm rifle and a 12–gauge bolt-action shotgun. Deborah and Ortiz stored those guns for Brock at Robert Cox's house. Brock requested possession of his guns a few days before July 6. On July 5, 2001, Ortiz obtained the guns from Cox around 7:00 a.m. When Brock asked Ortiz about his guns later that same evening, however, Ortiz told Brock that he was not able to get in touch with Cox.

The next day, July 6, 2001, Ashley found Ortiz at home around noon. He told Ashley that he and her mother had not spoken the night before and that "all hell was going to break loose when [Deborah] got home . . . ." That same afternoon, Deborah had called her friend, Amy Rust, around 2:00 or 2:30 p.m. from Mike Ratledge's house. Deborah called Rust later at 3:15 p.m. from her own home and told Rust she was about to get into the shower. She requested that Rust pick her up because she was late for work.

Tonya Russell, a neighbor of Deborah's, testified that on the afternoon of July 6, she saw Ortiz leave Deborah's residence, get into his truck, and go back inside the home. According to Russell, Ortiz was inside the residence for approximately three minutes and then left very quickly. Russell noticed smoke coming from Deborah's home about fifteen to twenty minutes after Ortiz left. Russell knocked on Deborah's bedroom window and the back door. After hearing no response, Tonya called 911 at 3:32 p.m. When Amy Rust arrived at Deborah's home, it was on fire. Firefighters and fire trucks were already on the scene.

As the firefighters were extinguishing the fire, they discovered the body of a female in the bathroom. The body appeared to have been decapitated. The female body was Deborah Clay's. An autopsy revealed that Deborah had been shot in the lower right abdomen and also had sustained a fatal shot to the right side of her head above her ear.

The Delaware State Police also responded to the scene of the fire at Deborah's home. On top of the washing machine, in an alcove adjacent to the bathroom, the

police discovered three pillows that were duct-taped together. The pillows had a hole in them that corresponded to a hole found in the paneling between the hall and the shower. Inside the pillows, police found half of a Sabot slug and also located two shotgun wads in the bathroom. The police found a hole in the shower stall that was about 22 inches from the top of the tub. It was estimated that Deborah was standing about 25 inches away from the wall when she was shot while standing in the shower.

The Chief Deputy Fire Marshall concluded that the fire at Deborah's home had been started intentionally by an open flame. He also determined that two fires had been set: one in the center bedroom and one in the rear bedroom. The police found a burned 12–gauge shotgun in one of the bedrooms.  ·

■ The police located Ortiz near Millsboro and took him into custody without incident. Among other things, police found an orange Philadelphia Flyers cigarette lighter. Ortiz told the police that the weapon he used to shoot Deborah was in her trailer. Ortiz stated that he was angry with Deborah and fired the shotgun at her from behind the wall while she was in the shower. Ortiz claimed that he thought the gun was "on safe." He then stated that he went to the bathroom, saw Deborah holding her side, and dropped the gun which went off when he dropped it. He ran from the house and traveled to the home near Millsboro, where he was eventually arrested.

### Supplemental Voir Dire Properly Denied

■ Pursuant to Superior Court Criminal Rule 24(a), Ortiz submitted a request for the trial judge to utilize a Supplemental Juror Questionnaire.[2] According to Ortiz's pretrial motion, the twenty-four questions contained in his proposed Supplemental Juror Questionnaire were drawn from a similar questionnaire that was used in a Federal District Court death penalty prosecution in Georgia.[3] The Superior Court denied Ortiz's request and ruled as follows:

Well, I think that the 40 some or so questions that we have discussed up to this point that the jurors will be asked are fully adequate to ferret out any possible bias on the part of any juror. I am not going to have them fill out this form.

Frankly, I think some of the questions in this form are none of the Court's business. Such as do you have an active role in the church. That is just to mention one. I think it is unduly burdensome on the jurors who are performing a simple civic duty of rendering a fair and impartial verdict to ask them to fill out forms like this. I am not going to do it in this case.

On appeal, Ortiz argues that the trial judge's decision not to use his proposed Supplemental Juror Questionnaire violated his right to an impartial jury under the Sixth Amendment to the United States Constitution and Article I, Section 7 of the Delaware Constitution. Ortiz simply referred to Article I, Section 7 of the Delaware Constitution in his Opening Brief summarily, after the legal analysis of his alleged Sixth Amendment violation. Ortiz made no legal argument and cited no case or other authority in support of his conclusory declarative assertion that his rights

---

2. The Supplemental Juror Questionnaire proposed by Ortiz is attached to this Opinion as Appendix B.

3. *See United States v. Battle,* 979 F.Supp. 1442 (N.D.Ga.1997).

under Article I, Section 7 in the Delaware Constitution had been violated. Therefore, that alleged violation of the Delaware Constitution will not be addressed because it was not fully and fairly presented to this Court as an issue on appeal.[4]

■■■■ For centuries, *voir dire* has been the method used to ascertain the impartiality of a prospective juror.[5] The purpose of *voir dire* is to ensure the selection of qualified jurors, who have no bias or prejudice that would prevent them from returning an impartial verdict based on the law and the evidence that is properly admitted during trial.[6] In order to identify unqualified jurors, the "[*v*]*oir dire* must be probing enough to reveal jurors' prejudices so the trial judge can ascertain whether a prospective juror would be impartial and for all counsel to evaluate each prospective juror for the purpose of making either a challenge for cause or exercising a peremptory challenge."[7]

Although the Sixth Amendment provides a defendant in a criminal proceeding with the right to a fair trial by an impartial jury,[8] the United States Constitution does not prescribe a protocol for conducting *voir dire*.[9] In *Aldridge,* the United States Supreme Court held that the extent of *voir dire* examination lies within the broad discretion of the trial judge.[10] Fifty years later, the Supreme Court reaffirmed that proposition in *Rosales–Lopez v. United States,* holding again that the "obligation to impanel an impartial jury lies in the first instance with the trial judge."[11] Therefore, the trial judge has broad discretion in determining how and to what extent to conduct *voir dire*.[12] Nevertheless, in *Rosales–Lopez,* the United States Supreme Court cautioned that there are "constitutional requirements" with regard to asking jurors about *racial* or *ethnic* bias.[13] In Ortiz's case, however, there were no issues of racial or ethnic bias.

4. *Roca v. E.I. du Pont de Nemours,* 842 A.2d 1238, 1242 (Del.2004). *Murphy v. State,* 632 A.2d 1150, 1152 (Del.1993). In the future, conclusory assertions that the Delaware Constitution has been violated will be considered to be waived on appeal. *See Abel v. State,* 773 N.E.2d 276 (Ind.2002); *State v. Perez,* 218 Conn. 714, 591 A.2d 119 (1991); *State v. Wareham,* 772 P.2d 960 (Utah 1989). In *Jones v. State,* we noted that "[s]everal other states have developed useful criteria for determining whether a provision in the United States Constitution has a meaning identical to a similar provision on the same subject in a state's constitution." *Jones v. State,* 745 A.2d 856, 864–65 (Del.1999) (identifying a partial list of those non-exclusive criteria as: textual language, legislative history, preexisting state law, structural differences, matters of particular state interest or local concern, state traditions, and public attitudes). The proper presentation of an alleged violation of the Delaware Constitution should include a discussion and analysis of one or more of the criteria set forth in *Jones* or other applicable criteria. *Id. See also Commonwealth v. Edmunds,* 526 Pa. 374, 586 A.2d 887 (1991).

5. *United States v. Burr,* 25 F.Cas. 49, 51 (Va. Cir.Ct.1807).

6. *Reyes v. State,* 819 A.2d 305, 310 (Del.2003).

7. *State v. Miller,* 197 W.Va. 588, 476 S.E.2d 535, 550 (1996).

8. *Morgan v. Illinois,* 504 U.S. 719, 729–30, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992); *Rosales–Lopez v. United States,* 451 U.S. 182, 188, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981).

9. *Morgan v. Illinois,* 504 U.S. at 729, 112 S.Ct. 2222.

10. *Aldridge v. United States,* 283 U.S. 308, 310, 51 S.Ct. 470, 75 L.Ed. 1054 (1931).

11. *Rosales–Lopez v. United States,* 451 U.S. at 189, 101 S.Ct. 1629.

12. *Id.*

13. *Id.* In *Rosales–Lopez,* the Supreme Court held, if there are circumstances in a case that indicate a "reasonable possibility that racial

In Delaware, the *voir dire* examination of prospective jurors in a Superior Court criminal prosecution is generally governed by Criminal Rule 24(a). In the specific context of a capital prosecution, however, the provisions of Del.Code Ann. tit. 11, § 3301, relating to "death-qualified" juries under the United States Supreme Court's holding in *Witherspoon v. Illinois*,[14] are also applicable. Delaware Superior Court Criminal Rule 24(a) provides that the trial judge shall either conduct or permit examination of jurors that is "reasonably calculated to ascertain prejudice of a juror."

The seminal decision by this Court involving jury *voir dire* procedure is *Parson v. State*.[15] In *Parson* and its progeny, this Court has consistently recognized that the method of conducting the *voir dire* examination of prospective jurors is a matter committed to the trial judge's discretion.[16] The exercise of that discretion is restricted only by constitutional requirements[17] and "the essential demands of fairness."[18]

Ortiz argues that jurors are less likely to admit any biases or prejudices through the individual voir dire questioning by the trial judge that is required in Delaware capital cases.[19] Ortiz submits that a juror would be more likely to admit a bias or prejudice through an "innocuous" questionnaire. Ortiz further argues that, without the use of his proposed Supplemental Juror Questionnaire, he was not able to gain insight into any biases or prejudices relating directly to the facts of his case or to jurors' views concerning the death penalty, that might have prompted him either to make a challenge for cause or to exercise a peremptory challenge.

The record reflects, however, that none of the questions in Ortiz's proposed Supplemental Juror Questionnaire were *directly* related to bias or prejudice. Rather, the inquiries in the Supplemental Juror Questionnaire proposed by Ortiz relate to level of education, length and type of employment, marital status, children, membership in organizations, religious affiliation, participation and contribution to victim's rights-type organizations, newspapers and magazines read,

---

or ethnic prejudice might have influenced the jury," a failure by the trial judge to grant a defendant's request to ask such questions about *racial* or *ethnic bias* would constitute reversible error. *Id.* at 191, 101 S.Ct. 1629. The Supreme Court qualified this statement, however, by noting that the United States Constitution leaves discretion to the trial judge when such circumstances are absent from a case. *Id.* The trial judge does not have a duty to defer to a defendant's request to question jurors on bias if there is "no rational possibility of racial prejudice." *Rosales–Lopez v. United States*, 451 U.S. at 189, 191 n. 7, 101 S.Ct. 1629. *See also Diaz v. State*, 743 A.2d 1166, 1174–75 (Del.1999) (mandatory *voir dire* involving bilingual jurors and English only speaking jurors, when a trial will involve an interpreter.).

14. *Witherspoon v. State of Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). *See Hobbs v. State*, 538 A.2d 723, 725 (Del. 1988).

15. *Parson v. State*, 275 A.2d 777, 780–84 (Del. 1971).

16. *Id.* at 780.

17. *Rosales–Lopez v. United States*, 451 U.S. 182, 189, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981).

18. *Parson v. State*, 275 A.2d at 780. *See also Hughes v. State*, 490 A.2d 1034, 1041 (Del. 1985) ("the nature and extent of voir dire examination rests within the sound discretion of the trial court"); *Van Arsdall v. State*, 486 A.2d 1, 13 (Del.1984), *vacated on other grounds and remanded*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *Hickman v. State*, 431 A.2d 1249, 1251 (Del.1981); *Hooks v. State*, 416 A.2d 189, 195 (Del.1980); *Shields v. State*, 374 A.2d 816, 821 (Del.1977), *cert. denied*, 434 U.S. 893, 98 S.Ct. 271, 54 L.Ed.2d 180 (1977).

19. Del.Code Ann. tit. 11, § 3301 (1974).

favorite radio stations and television programs, hobbies, whether one owns firearms, and bumper stickers.[20] The *voir dire* issue raised by Ortiz in this appeal was addressed by this Court in both *Parson*[21] and *Jacobs*.[22] In *Jacobs,* we stated:

> The sole purpose of voir dire examination in this State is to enable the judge to determine whether a prospective juror is qualified and able to render an impartial verdict upon the evidence and the law. "Any questions which go beyond the ascertainment of this ultimate fact are entirely irrelevant to the voir dire examination and are properly struck by the trial judge." This is particularly true as to questions which tend to argue the case in advance or which are designed to indoctrinate the jury or ascertain the advance reactions of its members to particular issues involved in the trial.[23]

We have concluded that the trial judge properly exercised his discretion in declining to utilize Ortiz's proposed Supplemental Juror Questionnaire. The record reflects that the twenty-four questions contained in Ortiz's proposed Supplemental Juror Questionnaire are either cumulative to the personal background information previously supplied by venire members on the standard Delaware juror questionnaire, or irrelevant to determining juror qualification, or are not the type of questions a prospective juror would be reluctant to answer during the individual *voir dire* questioning that occurs in a De-

laware capital murder proceeding. In Ortiz's case, the purpose of *voir dire* was accomplished by using the Superior Court's standard written jury questionnaire in combination with the eight questions asked by the trial judge of prospective jurors collectively and the forty-eight questions (with subparts) asked by the trial judge of each prospective juror individually under oath,[24] as supplemented by any proper follow-up questions requested by counsel for either party.

The *voir dire* conducted by the Superior Court in Ortiz's case was adequate for the trial judge to ascertain whether each prospective juror would be impartial.[25] It also was sufficient to enable Ortiz's attorney to evaluate each prospective juror for the purpose of either moving to excuse a juror for cause or exercising a peremptory challenge.[26] Accordingly, we hold that the Superior Court properly exercised its discretion in conducting the *voir dire* examination of the individual prospective jurors in Ortiz's capital murder trial.

### Extensive Display of Photographs and Video of the Victim Was Admissible

During the course of Ortiz's trial, the State presented numerous photographs and a videotape of the crime scene, as well as several autopsy slides. Ortiz contends "that the repetitive display to the jury of the nearly decapitated head wound by various means and at various times throughout the trial was a calculated effort

---

20. *See* Appendix B.

21. *Parson v. State,* 275 A.2d at 783.

22. *Jacobs v. State,* 358 A.2d 725, 728 (Del. 1976).

23. *Id. citing Parson v. State,* 275 A.2d at 783 (citations omitted). *Hughes v. State,* 490 A.2d at 1041.

24. *See* Appendix C.

25. *Manley v. State,* 709 A.2d 643, 655 (Del. 1998).

26. *Id.*

on the part of the State to impermissibly inflame the jury." Trial judges have very broad discretion in admitting photographic evidence of victims' injuries.[27] Accordingly, those evidentiary decisions will be upheld on appeal unless the defendant demonstrates there was a clear abuse of that broad discretion.[28]

Prior to commencement of Ortiz's trial, the parties informed the judge that they had agreed to address the admissibility of any photographs on a day-by-day basis, whenever it was likely that the testimony of a witness was going to involve photographic evidence. On the first day of trial, prior to opening statements, the defense objected to three photographs of the bathroom in Deborah's home (two blow-ups and one standard size) that the State wanted to introduce. The defense objected to the three photographs as cumulative and asked the State to select only one blow-up. The State argued that the three photographs were relevant to demonstrate the layout of the bathroom, the victim's head injury, and her "as-found" condition.

The issue was resolved the next day after the trial judge viewed the police videotape of the victim's home (to which the defense objected as cumulative, lengthy, and "in pretty shocking detail"). The trial judge decided to admit the forty-minute videotape and the two blow-up photographs. The trial judge ruled that they were relevant to the element of Ortiz's intent to kill and to his statement to the police that the shooting was accidental. The trial judge also concluded that evidence was not cumulative, stating:

> Now, as to the video, and after having viewed it myself, since the video is in motion, the viewer has to see a scan of the body more than once to fully grasp

what the video depicts. If one saw only one scan, in my opinion, a viewer would need to have it shown again to fully understand what was being shown.

> The three scans taken together aren't excessive in my opinion. The scans do not unduly dwell on the head wound. Neither the two still photos or the video are unfairly prejudicial to the defendant.

> Now, as to the length of the videotape, I'm satisfied that what the video depicts is relevant, particularly in light of the fact that one of the charges is arson, and I see no unfair prejudice to the defendant in the length of the videotape.

When the State later sought to admit smaller versions of the two blow-up photographs, the defense objected. The State argued that each smaller photograph was sharper in focus and there was no prejudice to Ortiz. The trial judge agreed. The trial judge also admitted four blow-up photographs showing the hole in the wall, with and without the trajectory rod, and showing the waterbed. The trial judge ruled that these photographs were not cumulative and there was no unfair prejudice to the defendant.

On appeal, in challenging the trial judge's decision to admit the videotape and the State's crime scene photographs, Ortiz submits:

> by the time that the forty-minute video had finished, the jurors were intimately familiar with every square inch of the walls, ceilings and floors of the five rooms in the trailer, as well as the evidence recovered from the fire damaged trailer. But more to the point, the jurors had been compelled to endure not one, not two, but three complete toe-to-head-to-toe panning sequences of the decedent, giving the decedent's soot cov-

---

27. *Conyers v. State,* 396 A.2d 157, 160 (Del. 1978).

28. *Id.*

ered and burned body the same inch-by-inch treatment as the rest of the video, which lingered each time on the severely traumatized head of the decedent. To heighten the effect, the State then moved into evidence over the [defendant's] objections two large two by four foot blow-ups which detailed the found condition and location of the body, just as the video had. Then, perhaps for fear that the jury might not yet have gotten the picture, the State moved into evidence the exact same photographic stills in regular sized prints of the views of the body as they had already admitted as blow-ups. Subsequently, the State moved into evidence over the [defendant's] objections, numerous still photographs depicting the same scenes from the video. Then, again, the State entered blow-ups of several of those same photographs into evidence. Finally, to dispel any lingering doubt, the State displayed all of the photographic stills on the overhead screen with the Elmo.

In this appeal, Ortiz also contends that the trial judge erroneously admitted several autopsy slides into evidence. When it was time for the Chief Deputy Medical Examiner to testify, the parties agreed that Dr. Pearlman would be examined outside the presence of the jury to explain why she wanted to use five autopsy slides to explain her testimony. Dr. Pearlman explained why each slide was necessary to explain how involved or extensive the victim's injuries were, the wound path, the point of entrance of the head wound, and the multiple entry wounds to the abdomen. Dr. Pearlman stated she wanted to use the photographs of the victim's extensive head injury to explain why she might be unable to answer questions about the path the bullet took through the brain.

After the *voir dire* examination of Dr. Pearlman was completed, the defense objected to the admission of three of the five slides (photographs one, two and four). The trial judge ruled that all five photographs were admissible, after weighing the probative value of each slide against any possible unfair prejudice to Ortiz:

All right. Well, I'm satisfied that these five photographs are ones which the doctor has determined will be helpful to her in giving her testimony. I understand that, you know, she may not know every question that's going to be asked and in exactly what context, but I'm satisfied that these are the pictures that she believes are necessary to fully explain her testimony.

As to the first three of the head, each of them are from a different angle, and I'm satisfied after listening to her testimony and looking at the photos, that all three in combination are probative and material to her explanation of the nature of the gun wound and the angle of the wound, et cetera. I can understand that given the relatively massive nature of the wound, it may not be possible to state with exactitude the angle of the wound, but I'm satisfied that she can testify to that with the aid of these three pictures to the extent that the evidence allows.

As to the final two, they do—they are different in that one shows the larger wound and the other shows a smaller wound, and I think they both have independent probative value. And I'm satisfied that the evidentiary value of each of the five slides outweighs any potential of unfair prejudice to the defendant.

I will instruct the jury that they are to consider these exhibits only for the purpose of assisting them in understanding the testimony of this witness, and for no other purpose.

Prior to Dr. Pearlman's testimony before the jury, the trial judge instructed the jury that the sole purpose for admitting the autopsy slides into evidence was to assist the jury in understanding Dr. Pearlman's testimony. The trial judge added, "You may use the information only for understanding this witness' testimony and for no other purpose." Thereafter, Dr. Pearlman used a laser pointer with the first three slides while describing the gunshot injury to Deborah Clay's head. Dr. Pearlman used the remaining two slides to explain the nature of the abdominal wound the victim suffered, and the thermal injury or singeing of victim's skin due to the fire.

The State argues that the various photographs, videotape, and autopsy slides were probative of the victim's injuries and the circumstances of her shooting, and were relevant to rebut Ortiz's claim of an accidental shooting. The State submits that its photographic exhibits were also probative of the fires that had been intentionally set in the victim's home, which were relevant to Ortiz's state of mind in covering up or destroying the evidence of his crime. In support of its arguments, the State notes that Ortiz told the police that the shooting was accidental. According to Ortiz, he fired in anger at Deborah through the wall thinking the gun was "on safe" then ran around to the bathroom, saw her holding her side and dropped the gun, discharging it a second time.

This Court has consistently held that photographs of a murder victim and the crime scene may be admitted into evi-

dence, even if they are graphically gruesome, as long as they have probative value.[29] In *Casalvera v. State*,[30] we held that "[a] prosecutor is not required to minimize [a brutal murder] by selecting the least dramatic means of presenting his [or her] evidence."[31] In *Casalvera*, although alternative formats for the presentation of the evidence were available, including descriptive testimony by the witnesses, we concluded that the trial judge properly exercised his discretion in refusing to require use of an alternative format by the State of a single crime scene photograph and two autopsy slides.[32] In *Trader v. State*,[33] this Court determined that two photographs taken at the hospital showing the extent of injuries suffered by the decedent, and two autopsy slides were not excessive in order to show the nature and extent of the decedent's wounds, and to allow the State to address the defendant's self-defense claim.[34]

In Ortiz's case, the record reflects that the trial judge was aware of the potential for jurors' passions to become inflamed from viewing the videographic and photographic evidence presented by the State. For example, before Ortiz could submit a proposed form of instruction, the trial judge presented the parties with a proposed limiting instruction concerning the videotape for their review. That instruction was subsequently given to the jury.

■ A trial judge has broad discretion in deciding to permit the introduction and display of photographs of murder victims.[35]

29. *Bailey v. State*, 490 A.2d 158, 167 (Del. 1983); *Diaz v. State*, 508 A.2d 861, 865–66 (Del.1986); *Dickens v. State*, 437 A.2d 159, 162 (Del.1981).

30. *Casalvera v. State*, 410 A.2d 1369 (Del. 1980).

31. *Id.* at 1373.

32. *Id.*

33. *Trader v. State*, 1993 WL 433521 (Del. Oct. 12, 1993).

34. *Id.*

35. *See, e.g., Virdin v. State*, 780 A.2d 1024, 1035–36 (Del.2001); *Bridges v. State*, 706 A.2d 489, 491–92 (Del.1998); *Keperling v. State*, 699 A.2d 317, 320 (Del.1997); *Casalvera v. State*, 410 A.2d 1369, 1372–73 (Del.

In Ortiz's case, the trial judge heard the arguments of the respective attorneys and watched the videotape of the crime scene twice, prior to ruling on its admissibility. The trial judge admitted the autopsy slides only after *voir dire* of the Deputy Chief Medical Examiner and hearing argument from the respective attorneys.

■ Although some of the State's photographic evidence that was introduced at Ortiz's trial may have been gruesome, we adhere to our prior holding that "a prosecutor is not required to minimize [a brutal murder] by selecting the least dramatic means of presenting his evidence." [36] Each time Ortiz objected on the basis that any of the State's photographic evidence appeared to be unfairly cumulative, the trial judge balanced the probative value of each exhibit against the potential for unfair prejudice to Ortiz and found the former was not outweighed by the latter before ruling that the exhibit was admissible. Moreover, before the videotape was shown to the jury and before the Chief Deputy Medical Examiner testified using the autopsy slides, the trial judge gave appropriate limiting instructions to the jury.[37] Under all of these circumstances, we hold that the trial judge properly exercised his discretion in admitting the State's videotape, photographs of the victim and autopsy slides into evidence—individually and collectively—at Ortiz's trial.

### Prior Bad Acts, Penalty Phase, No Plain Error

■ On the second day of Ortiz's capital penalty hearing, Ron Drake, an institutional investigator with the Delaware Department of Corrections in Smyrna, testified on behalf of the State. Drake described his investigation of a September 19, 1998 prison assault committed upon inmate Vincent Spicer, who was hospitalized for two days as a result of the attack. According to Drake, Ortiz admitted to Drake that he was the individual who assaulted Spicer in Spicer's prison cell. After this admission, Drake arrested Ortiz. On April 20, 1999, Ortiz pled guilty to the felony offense of Assault in the Second Degree involving the Vincent Spicer attack.

After presenting three additional prosecution witnesses on the morning of the third day of Ortiz's penalty hearing (Monday, August 11, 2003), the State rested at 11:45 a.m. During the afternoon of August 11, and over the following two days, Ortiz presented a dozen defense witnesses, including his mother, Dolores A. Ball, who testified on two separate occasions. After Ortiz elected not to testify on the fifth day of his penalty hearing, the defense rested.

On the afternoon of August 13, 2003, the State recalled Drake as a rebuttal witness at the penalty hearing. Although there was no initial defense objection to Drake being recalled as a rebuttal witness, Ortiz did object when the prosecutor asked Drake if he had investigated a January 2003 connection between inmate Ortiz and a former prison counselor named Jodene Donovan. At that point, there was an extended colloquy between counsel and the trial judge, which stated, in part:

[Defense Counsel]: Thank you, Your Honor.

Your Honor, the State put on their case, presented 50 write-ups for Mr. Ortiz. Presumably to show Mr. Ortiz as they would want to argue difficulties adjust-

---

1980); *Shantz v. State,* 344 A.2d 245, 246 (Del.1975).

**36.** *Casalvera v. State,* 410 A.2d at 1373.

**37.** *See Virdin v. State,* 780 A.2d at 1036 n. 48; *Keperling v. State,* 699 A.2d at 320.

ing to life in prison and assertion that there would be not much likelihood of a continued good adjustment, serious problems, et cetera.

And I would assert, Your Honor, that at that time, any evidence that they had pertaining to those issues they should have presented in their case-in-chief. Everything that we presented in our case was intended to meet the evidence that they presented. And now it seems that they want to raise yet another issue of Mr. Ortiz.

. . .

[Prosecutor]: Well, it's directly calculated to meet testimony they presented through correctional officers that they believe he will adjust well in prison, will not present a problem if he is sentenced to life in prison, and they've never had any problems with him. It is not sandbagging. It is in direct rebuttal to that, and candidly, we saw yesterday that the defense had brought in a woman named Jodene Donovan, and we asked Mr. Drake to be here today largely because of that.

But this evidence goes directly to the evidence that they presented from correctional officers that he is not presented a problem and that he does—they do not expect him to be a problem in the future. You know if the defense wants surrebuttal, we would not object to that. We are not trying to sandbag anyone. This is relevant to that contention that he does not present a problem in the prison because he does.

[Defense Counsel]: Your Honor, wasn't our evidence directed towards the State's assertion and their evidence in their case that he would propose an ongoing problem[?] Therefore, that is an aggravating factor. We are entitled to present the counter information.

. . .

The Court: Well, you know, my conclusion is that what they wish to present is in rebuttal of the testimony from several correctional officers that he is a good inmate. He follows the rules and doesn't create any trouble. Your objection is overruled.

At trial, the Ortiz objection to Drake's anticipated rebuttal testimony regarding the connection between Ortiz and counselor Donovan was that this new evidence was "sandbagging."[38] In response to Ortiz's contention that recalling prison investigator Drake on rebuttal was an impermissible "sandbagging" tactic, the prosecutor stated: "if the defense wants surrebuttal, we would not object to that." The trial judge overruled Ortiz's "sandbagging" objection.

When Drake's rebuttal testimony was completed, the State indicated that it had no other rebuttal witnesses, the trial judge specifically asked defense counsel: "Yesterday you expressed an interest in surrebuttal." Ortiz's counsel responded: "Just if it became necessary. Was a possibility, Your Honor. We do not anticipate doing that." When Ortiz declined the opportunity to present surrebuttal, his penalty hearing proceeded to the closing arguments by counsel and Ortiz's allocution.

---

38. *Robertson v. State*, 630 A.2d 1084, 1094–95 (Del.1993) ("The standard of appellate review regarding the trial judge's action following an objection that the prosecutor engaged in 'sandbagging' is abuse of discretion."). *Johnson v. State*, 550 A.2d 903, 913 (Del.1988); *DeShields v. State*, 534 A.2d 630, 645 (Del. 1987); *Grayson v. State*, 524 A.2d 1, 3 (Del. 1987); *Bailey v. State*, 440 A.2d 997, 1003–04 (Del.1982) (the trial judge abused his "discretion in permitting the State to utilize the inherently prejudicial 'sandbagging' trial strategy").

Although Ortiz objected to Drake's rebuttal testimony at his penalty hearing as a "sandbagging" tactic by the prosecution, Ortiz has abandoned that contention on appeal. On appeal, Ortiz argues that Drake's rebuttal testimony at the penalty hearing included the improper presentation of "unadjudicated crimes evidence." In that regard, also for the first time on appeal, Ortiz alleges that the trial judge erred by not making a judicial determination, after the State's proffer regarding the nature of Drake's anticipated rebuttal testimony, that "the State's evidence was plain, clear and convincing."

■ Since Ortiz made no objection at his penalty hearing to Drake's anticipated rebuttal testimony as "unadjudicated crimes evidence," that contention may now be reviewed on appeal only for plain error.[39] To be plain, the error must have adversely affected the outcome of Ortiz's penalty hearing.[40] The burden of establishing plain error is on the defendant.[41]

In rebuttal at Ortiz's penalty hearing, Drake testified that in January 2003, he began investigating a possible connection between inmate Ortiz and Jodene Donovan, who was then employed as a counselor in the unit of the Smyrna prison where Ortiz was housed. Before working as a counselor, Donovan had been a correctional officer. Prior to January 2003, Drake had received information that there was a relationship between Donovan and a former prison inmate named Eric Myers, a friend of Ortiz. The two had previously been prison cellmates.

During his investigation, Drake learned that Myers might be cohabiting with Donovan. At that time there was an outstanding violation of probation warrant for Myers' arrest. While waiting in the Delaware Correctional Center parking lot at the end of the workday, Drake and another investigator named Richardson observed Eric Myers arriving in Donovan's automobile to pick her up after work. Myers was arrested by Drake and Richardson on his outstanding warrant. Donovan was advised to report to the warden's office the following morning.

The next morning, Donovan was given a urine drug test. Earlier that day or the previous evening, all of the inmates in A-tier of the unit where Ortiz was housed were also directed to submit to a urine analysis. According to Drake, Ortiz "tested positive for cocaine," and he was the only inmate on the tier to test positive.

Donovan resigned her job as a prison counselor that same day, even before the drug test results were available. When Donovan's drug test results were received, it was discovered that she had also "tested positive for cocaine." After Donovan's resignation, it was necessary to cut the lock off her office locker because corrections officials were unable to locate a key to that locker.

Ms. Herr, a corrections department employee, later told Drake that she thought

39. Del.Supr. Ct. R. 8; D.R.E. 103(d); *Capano v. State,* 781 A.2d 556, 653 (Del.2001); *McDade v. State,* 693 A.2d 1062, 1064 (Del. 1997); *Chance v. State,* 685 A.2d 351, 354 (Del.1996).

40. *Wainwright v. State,* 504 A.2d 1096, 1100 (Del.1986), *cert. denied,* 479 U.S. 869, 107 S.Ct. 236, 93 L.Ed.2d 161 (1986) ("Under the plain error standard of review, the error complained of must be so clearly prejudicial to

substantial rights as to jeopardize the fairness and integrity of the trial process."); *see also Floray v. State,* 720 A.2d 1132, 1137 (Del. 1998); and *United States v. Olano,* 507 U.S. 725, 732–34, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

41. *Brown v. State,* 729 A.2d 259, 265 (Del. 1999); *United States v. Olano,* 507 U.S. at 732, 113 S.Ct. 1770 (federal plain error rule).

Ortiz had a key to Donovan's locker because she had previously observed Ortiz open the locker. After receiving this information, Drake searched Ortiz's belongings and found the key to Donovan's locker inside an envelope. Drake testified that it was a violation of prison policy for Donovan to have furnished an inmate with a key to her personal locker.

In this appeal, the State submits that, given the favorable penalty hearing testimony presented by Ortiz from three Delaware Department of Corrections employees, the trial judge did not abuse his discretion by permitting Drake to be recalled as a rebuttal witness on behalf of the State. The day before Drake's rebuttal testimony, Paul Unsworth, a security officer at the Delaware Correctional Center in Smyrna for twenty-three years testified on Ortiz's behalf at the penalty hearing.[42] After Unsworth testified on behalf of Ortiz at the penalty hearing, the defense called Delaware Correctional Center Lieutenant John Endres as a mitigation witness.[43] Lisa M. Merson, a third Delaware Correctional Center employee,

also testified favorably on behalf of Ortiz at his capital penalty hearing.[44]

The State submits that Drake's penalty hearing testimony was "proper rebuttal and there was no abuse of discretion by the trial judge in allowing evidence of an association between a former prison counselor, Donovan, and Ortiz, as well as Ortiz's positive test for cocaine consumption." On appeal, Ortiz contends that the trial judge erred by not making a determination that the proffered evidence about Ortiz's unadjudicated criminal acts was "plain, clear and convincing."[45] In making this argument for the first time on appeal, Ortiz cites State v. Cohen, where the Superior Court stated that, "[b]ecause of the potential impact of evidence of unadjudicated crimes, particularly in this case and in any capital penalty proceeding, the Court holds that such evidence is admissible [only] if it is plain, clear and convincing."[46]

In Ortiz's case, although the trial judge did not make an explicit determination, the record reflects that the locker key and positive drug test evidence satisfy the plain, clear and convincing standard enun-

---

42. Unsworth stated that he had supervised Ortiz at the Smyrna prison. According to Unsworth, Ortiz "was very compliant" and Ortiz had been the crew boss for E-tier in charge of cleaning that prison tier during his prior incarceration. According to Unsworth, Ortiz "was a hard worker" and he "interacted very good with inmates and staff." Unsworth testified he believed that if Ortiz was sentenced to life in prison, Ortiz would beneficially adjust to his situation and work with the prison personnel and other inmates.

43. Lieutenant Endres had previously supervised Ortiz at the Smyrna prison dining hall. Endres described Ortiz as generally quiet, observant of the dining hall rules, and not a troublemaker. Ortiz had never received any write-ups from Endres and "he never presented any problems."

44. Merson had worked for the Delaware Department of Corrections for fifteen years. She was currently employed as chairperson of the inmate grievance committee. Merson had supervised Ortiz during his prior incarceration. She testified that "Mr. Ortiz always did as he was told, followed my orders. He was respectful. Kept his cell clean, kept himself clean, never caused me any problems." Merson had never observed Ortiz have a problem with other correctional staff, and he "interacted well" with other inmates. Like Unsworth, Merson also thought that if Ortiz was sentenced to life in prison, he would be able to adjust and work beneficially with the prison staff and other inmates.

45. State v. Cohen, 634 A.2d 380, 391 (Del.Super.1992).

46. Id.

ciated by the Superior Court in *Cohen*[47] and by this Court in *Getz*.[48] Drake testified that possession by an inmate of a key to a correctional employee's personal locker was a violation of prison policy. Drake's rebuttal testimony was that he personally found Donovan's locker key among Ortiz's possessions at the prison. Although afforded the opportunity for surrebuttal, Ortiz offered no evidence that his possession of the locker key was not contrary to prison rules. Drake's rebuttal testimony on the positive drug test was also plain, clear and convincing evidence. Drake testified that Ortiz was the only inmate on pre-trial A-tier who tested positive for cocaine. That drug testing result was not disputed by Ortiz at his penalty hearing.

### New Penalty Hearing Properly Denied

■ After the penalty phase had concluded, but before sentencing occurred, the defense moved for a new penalty hearing under Superior Court Criminal Rule 33. In support of that motion, Ortiz relied upon a letter to the trial judge from Ashley Clay, the victim's daughter, which stated that she did not want Ortiz to be sentenced to death. The defense argued that a new penalty hearing was warranted "in the interest of justice because Ashley had been a significant prosecution witness during the guilt and penalty phases of the trial, and her feelings about the death penalty had not been presented before." The Superior Court denied the motion, ruling in relevant part, as follows:

Victim impact evidence is admissible within certain limitations at a penalty hearing. But I do not think that a direct opinion on the punishment, which a defendant should receive, is admissible.

To the extent that the proffered testimony is admissible, or deemed admissible, I think that the proper time to present it was before the jury at the penalty hearing.

I agree with the State that I do not think that a change of mind, so to speak,[49] is grounds for granting a new penalty hearing. I do not believe that the letter justifies a new penalty hearing.

In *Payne v. Tennessee*,[50] the United States Supreme Court overruled the bar to the introduction of and comment upon victim impact evidence which had been established by its decisions in *Booth*[51] and *South Carolina v. Gathers*.[52] However, footnote two of the *Payne* opinion states:

Our holding today is limited to the holdings of *Booth v. Maryland* and *South Carolina v. Gathers*, that evidence and argument relating to the victim and the impact of the victim's death on the victim's family are inadmissible at a capital sentencing hearing. *Booth* also held that the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth

47. *Id.*

48. *Getz v. State*, 538 A.2d 726 (Del.1988).

49. The record reflects that Ashley had previously advised the prosecution that she agreed with the other members of her family who concurred with the State's decision to seek the death penalty for Ortiz.

50. *Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).

51. *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987) (internal citations omitted), *overruled in part by Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).

52. *South Carolina v. Gathers*, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989), *overruled by Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).

Amendment. No evidence of the latter sort was presented at the trial in this case.[53]

The State cites *Booth* in support of the proposition that a victim's family member's opinion about appropriateness of sentencing is not admissible evidence. The State argues that the admission of a victim's family member's opinion about the life or death sentence the defendant in a capital murder prosecution is to receive, violates the Eighth Amendment because the prohibition in *Booth* against this specific type of evidence was not overruled in *Payne*. Courts that have considered the very same issue support the State's position and are unanimous in ruling that the constitutional ban in *Booth* on such evidence survived the United States Supreme Court's decision in *Payne v. Tennessee*,[54] which permitted certain other victim impact evidence to be admitted.[55] In *Robison*, for example, the United States Court of Appeals for the Tenth Circuit held:

> We cannot agree that *Payne* portends admissibility of any evidence other than that related to the victim and the impact of the victim's death on the members of the victim's family. Nothing said by the [Supreme] Court suggests the [Supreme] Court intended to broaden the scope of relevant mitigating evidence to include the opinion of a victim's family member that the death penalty should not be invoked. Indeed, the last two sentences in the limiting language of the

Chief Justice in footnote 2 suggests the opposite result.[56]

Most recently, the Nevada Supreme Court stated: "We join our sister courts in rejecting the proposition that opinions in opposition to the death penalty fall within the parameters of admissible victim impact testimony or rebuttal thereto."[57]

On appeal, Ortiz argues that because Delaware law allows victims of crime or their family members the opportunity to express their feelings on the crime and its effect on them,[58] in the special circumstances where a victim's family member wishes to speak in mitigation for the defense, it should be allowed. The record reflects, however, that the jury did hear Ashley testify favorably in mitigation for the defense. On cross-examination, during the guilt phase of the trial, Ashley recounted how she first met Ortiz when she was six years old, how she and her mother grew to love and trust him, how pleased Ashley was about their plans to marry, and how supportive Ortiz was during Ashley's emotional break-up with her boyfriend. During the penalty phase, Ashley testified that she had trusted Ortiz more than anyone else in the world.

In its motion for a new penalty hearing, defense counsel acknowledged that mitigation testimony from Ashley had already been heard by the jury:

> The letter clearly states that she would be in more pain if, in fact, he was put to death, and that taking another parent from her is not going to help her.

---

**53.** *Payne v. Tennessee,* 501 U.S. 808, 830 n. 2, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).

**54.** *Id.*

**55.** *Id.* at 827–30, 111 S.Ct. 2597. *See Robison v. Maynard,* 943 F.2d 1216, 1217–18 (10th Cir.1991); *People v. Smith,* 30 Cal.4th 581, 134 Cal.Rptr.2d 1, 68 P.3d 302, 329–30 (2003); *Ware v. State,* 360 Md. 650, 759 A.2d

764, 783–84 (2000) (citing cases); *Kaczmarek v. State,* 91 P.3d 16, 32–34 (Nev.2004); *Commonwealth v. Bomar,* 573 Pa. 426, 826 A.2d 831, 851–52 (2003).

**56.** *Robison v. Maynard,* 943 F.2d at 1217.

**57.** *Kaczmarek v. State,* 91 P.3d at 34.

**58.** *Petition of State,* 597 A.2d 1, 3 (Del.1991).

She does say that her family does hate him but that she cannot. And you know, he has been part of her life and, more or less, has been a father figure to her.

This information some of it did come out in the trial in the penalty phase in terms of being the father figure, in terms of being there for her, and sticking up for her, and things of that nature, but the fact is that he views, her feelings as to the death penalty itself, did not come out, and this information, Your Honor, given the fact that she was a significant witness would have had some influence on the jurors, and therefore, this information wasn't provided and a new penalty hearing is warranted in the interest of justice.

We hold the trial judge properly exercised his discretion in denying Ortiz's motion for a new penalty hearing. To the extent that the defense wanted to present Ashley's testimony in opposition to the death penalty to the jury, we hold that the trial judge correctly decided such testimony was inadmissible.[59] To the extent that the other proffered testimony from Ashley could have been considered as proper mitigating evidence reflecting upon Ortiz's character,[60] the defense acknowledged that it would have been cumulative of Ashley's prior guilt and penalty phase testimony. Therefore, the trial judge properly concluded that Ortiz was not entitled to a new penalty hearing for the purpose of presenting additional cumulative testimony from the victim's family member, Ashley, who had already presented mitigating evidence.

### Delaware's Death Sentence Procedure Upheld

■ In this direct appeal, for the first time, Ortiz challenges the validity of the Delaware death penalty statute.[61] Ortiz argues that, as applied in his prosecution for capital murder, the Delaware statutory procedure violates his Sixth Amendment jury trial right as recognized by the United States Supreme Court in *Apprendi v. New Jersey*[62] and in *Ring v. Arizona*.[63] According to Ortiz, his death sentence is unconstitutional because it was based, at least in part, on non-statutory aggravators found by the trial judge but not found by the jury by proof beyond a reasonable doubt.

Section 4209(c)(3)a of the Del.Code Ann. sets out the procedure by which the jury is to determine whether the defendant is death eligible. It states:

Upon the conclusion of the evidence and arguments the judge shall give the jury appropriate instructions and the jury shall retire to deliberate and report to the Court an answer to the following questions:

1. Whether the evidence shows beyond a reasonable doubt the existence of at least 1 aggravating circumstance as enumerated in subsection (e) of this section; and

2. Whether, by a preponderance of the evidence, after weighing all relevant evidence in aggravation or mitigation which bear upon the particular circumstances or details of the commission of the offense and the character and propensities of the offender, the aggrava-

**59.** *See Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).

**60.** *See People v. Smith,* 30 Cal.4th 581, 134 Cal.Rptr.2d 1, 68 P.3d 302, 329–31 (2003).

**61.** Del.Code Ann. tit. 11, § 4209 (2002).

**62.** *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

**63.** *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

ting circumstances found to exist outweigh the mitigating circumstances found to exist.[64]

Section 4209(d) provides for the "determination of sentence:"

> If a jury has been impaneled and if the existence of at least 1 statutory aggravating circumstance as enumerated in subsection (e) of this section has been found beyond a reasonable doubt by the jury, the Court, after considering the findings and recommendation of the jury and without hearing or reviewing any additional evidence, shall impose a sentence of death if the Court finds by a preponderance of the evidence, after weighing all relevant evidence in aggravation or mitigation which bears upon the particular circumstances or details of the commission of the offense and the character and propensities of the offender, that the aggravating circumstances found by the Court to exist outweigh the mitigating circumstances found by the Court to exist.[65]

After the conclusion of Ortiz's capital penalty hearing, the jury found unanimously beyond a reasonable doubt the existence of the statutory aggravating circumstance that Ortiz was previously convicted of a felony involving the use of, or threat of, force or violence upon another person.[66] The jury found, by a vote of 9–3, a statutory aggravating circumstance of premeditation and substantial planning in the commission of the murder.[67] The jury concluded, by a vote of 11–1, by a

preponderance of the evidence, that the aggravating factors outweighed the mitigating factors.[68]

In his eighteen-page written sentencing opinion, the trial judge stated "[b]ecause the jury unanimously concluded that the evidence showed beyond a reasonable doubt the existence of a statutory aggravating circumstance, the defendant is eligible for the death penalty." [69] Thereafter, the trial judge applied the Delaware death penalty statutory procedure (Del.Code Ann. tit. 11, § 4209), as amended after the June 24, 2002 decision of the United States Supreme Court in *Ring v. Arizona*.[70] In his written sentencing opinion, the trial judge summarized the factual evidence in Ortiz's case and reviewed the evidence in aggravation and mitigation that had been presented during the penalty phase.

The trial judge's written sentencing opinion sets forth his findings as to the existence of both non-statutory aggravating and mitigating circumstances. The trial judge's opinion acknowledged the 2003 amendment to Del.Code Ann. tit. 11, § 4209(d) and stated that he was not applying the statute, as amended. The trial judge concluded that the aggravating circumstances he found to exist outweighed the mitigating factors he found to exist. The trial judge sentenced Ortiz to death.

Ortiz's contention that a jury, not the judge, must find the non-statutory aggravators has been addressed and answered by this Court's decision in *Brice*.[71] In

---

**64.** Del.Code Ann. tit. 11, § 4209(c)(3)a (2002).

**65.** *Id.* § 4209(d)(1).

**66.** *See id.* § 4209(e)(1)i. In fact, Ortiz had three prior Assault Felony convictions in the Second Degree and an Unlawful Sexual Contact Felony conviction in the Second Degree.

**67.** *See id.* § 4209(e)(1)u.

**68.** *See id.* § 4209(c)(3)a.2.

**69.** *State v. Ortiz*, 2003 WL 22383294, at *4 (Del.Super. Sept. 26, 2003).

**70.** *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

**71.** *Brice v. State*, 815 A.2d 314, 321–22 (Del. 2003).

*Brice,* we held that the United States Supreme Court decision in *Ring* only applies to the narrowing phase of Delaware's "hybrid" capital punishment system.[72] In *Brice* we held, contrary to Ortiz's present argument, that *"Ring* does not, however, require that the jury find every fact relied upon by the sentencing judge in the imposition of the sentence."[73] We explained our rationale for that legal conclusion, as follows:

> The narrowing phase under the 2002 statute simply requires a jury to find, unanimously and beyond a reasonable doubt, the existence of at least one statutory aggravating circumstance before the sentencing judge may consider imposing the death sentence. Non-statutory aggravators, if considered at all, do not enter the mix until after the jury performs its essential function during the narrowing phase. Accordingly, a finding of non-statutory factors does not "increase" the maximum penalty that a defendant can receive. Rather, non-statutory aggravators are part of the total mix, including mitigating factors when the sentencing judge performs his function during the weighing phase.[74]

Ortiz became death eligible under *Apprendi* and *Ring* when his jury unanimously found beyond a reasonable doubt the existence of one of the statutory aggravating circumstances alleged by the prosecution—a prior violent felony conviction involving use of, or threat of, force or violence upon another person.[75] Ortiz's argument fails to recognize the distinction between the narrowing and weighing phases in the statutory structure of Delaware's capital sentencing procedure.[76] As we stated in *Brice:*

> Although a judge cannot sentence a defendant to death without finding that the aggravating factors outweigh the mitigating factors, it is not that determination that increases the maximum punishment. Rather, the maximum punishment is increased by the [jury's unanimous] finding [beyond a reasonable doubt] of the statutory aggravator. At that point a judge can sentence a defendant to death, but only if the judge finds that the aggravating factors outweigh the mitigator factors. Therefore, the weighing of aggravating circumstances against mitigating circumstances does not increase the punishment. Rather, it ensures that the punishment imposed is appropriate and proportional.[77]

Once again,[78] we adhere to our holding in *Brice* that Delaware's hybrid form of sentencing, allowing the jury to find the defendant death eligible and then allowing a judge to impose the death penalty once the defendant is found to be death eligible, is not contrary to the Sixth Amendment of the United States Constitution, as construed in *Apprendi*[79] and *Ring.*[80]

---

**72.** *Id.* at 321–22. Accord *Swan v. State,* 820 A.2d 342, 359 (Del.2003) ("In *Brice,* this Court addressed several questions concerning the 2002 amendment to § 4209, and held that *Ring* only extends to the narrowing phase of the sentencing process.").

**73.** *Brice v. State,* 815 A.2d at 322.

**74.** *Id.*

**75.** *Id.* ("Once the jury determines that a statutory aggravating factor exists, the defendant becomes death eligible."); *Swan v. State,* 820 A.2d at 359.

**76.** *See Swan v. State,* 820 A.2d at 359 (*"Ring* only extends to the narrowing phase of the sentencing process.").

**77.** *Brice v. State,* 815 A.2d at 322.

**78.** *Swan v. State,* 820 A.2d at 359.

**79.** *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

■ We also find no merit in Ortiz's argument that the constitutionality of his death sentence and the Delaware death penalty statute are affected by the recent decision of the United States Supreme Court in *Blakely v. Washington.*[81] *Blakely* was a noncapital case that involved an interpretation of Washington State's presumptive sentencing guidelines.[82] *Blakely* held that the "'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant."[83]

In Delaware, Ortiz became eligible for the statutory maximum (death) upon the jury's unanimous finding beyond a reasonable doubt of a statutory aggravating factor. Only then was the trial judge able to sentence Ortiz to death. The statutory structure of Delaware's capital sentencing procedure comports with the standard set forth by the United States Supreme Court in the *Blakely* decision and its decision in *Booker* that was issued last week.[84]

### Death Penalty Statutorily Mandated Review

■ This Court must now undertake the review that is statutorily mandated following the imposition of a death sentence in Delaware.[85] Although the statutory review by this Court is limited, that review is not perfunctory.[86] A death

sentence may be imposed only in accordance with the bifurcated procedure prescribed by Del.Code. Ann. tit. 11 § 4209. Section 4209(g)(2) provides:

The Supreme Court shall limit its review under this section to the recommendation on and imposition of the penalty of death and shall determine:

a. Whether, considering the totality of evidence in aggravation and mitigation which bears upon the particular circumstances or details of the offense and the character and propensities of the offender, the death penalty was either arbitrarily or capriciously imposed or recommended, or disproportionate to the penalty recommended or imposed in similar cases arising under this section.

b. Whether the evidence supports the jury's or the judge's finding of a statutory aggravating circumstance as enumerated in subsection (e) of this section and, where applicable, § 636(a)(2)-(7) of this title.[87]

In performing its mandatory statutory review, this Court remains cognizant that "death as a punishment is unique in its severity and irrevocability."[88]

This Court has traditionally commenced its mandatory statutory review by initially addressing subparagraph (b) of Section 4209(g)(2). That subsection requires this

**80.** *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

**81.** *Blakely v. Washington,* —— U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).

**82.** *Id.*

**83.** *Id.* at 2537.

**84.** *United States v. Booker,* —— U.S. ——, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005).

**85.** Del.Code Ann. tit. 11, § 4209(g) (1974). See, e.g., *Jackson v. State,* 684 A.2d 745, 754

(Del.1996); *Gattis v. State,* 637 A.2d 808, 821–23 (Del.1994); *Dawson v. State,* 637 A.2d 57, 65–68 (Del.1994); *Sullivan v. State,* 636 A.2d 931, 948–51 (Del.1994); *Wright v. State,* 633 A.2d 329, 339–43 (Del.1993).

**86.** *Dawson v. State,* 637 A.2d at 65. *See Dobbert v. Florida,* 432 U.S. 282, 295, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977).

**87.** Del.Code Ann. tit. 11, § 4209(g)(2) (2002).

**88.** *Dawson v. State,* 637 A.2d at 66 (quoting *Pennell v. State,* 604 A.2d 1368, 1375 (Del. 1992) (citation omitted)).

Court to examine the evidence in the record to determine whether it supports the findings of the Superior Court judge which relate to the establishment of statutory aggravating circumstances.[89] Thereafter, two additional inquiries are required by subparagraph (a) of Section 4209(g)(2): first, whether the Superior Court judge's imposition of the death penalty was arbitrary or capricious; and second, whether the death penalty imposed was disproportionate to the penalty imposed in similar cases arising under this statute. Each question requires a consideration of the totality of evidence in aggravation and mitigation, which bears upon the particular circumstances or details of the offense and the character and propensities of the offender.[90]

### Capital Sentencing Phases

■ There are two phases in Delaware's capital sentencing process.[91] The eligibility phase narrows the class of death-penalty-eligible defendants by requiring the State to prove the existence of at least one statutorily defined aggravating circumstance.[92] In the eligibility phase, the jury recommends an answer to the following question:

> Whether the evidence shows beyond a reasonable doubt the existence of at least 1 aggravating circumstance as enumerated in subsection (e) of this section
> . . . . [93]

If the State discharges that burden, the selection phase follows and a determination is made whether to impose a sentence of life or death on the death-penalty eligible defendant.[94] In the selection phase, the jury recommends an answer to the following question:

> Whether, by a preponderance of the evidence, after weighing all relevant evidence in aggravation or mitigation which bear upon the particular circumstances or details of the commission of the offense and the character and propensities of the offender, the aggravating circumstances found to exist outweigh the mitigating circumstances found to exist.[95]

During the eligibility phase in Ortiz's case, the jurors answered the statutory question in the affirmative by a unanimous vote, with regard to the existence of the statutory aggravating circumstance that Ortiz was previously convicted of a felony involving the use of, or threat of, force or violence upon another person.[96] During the selection phase, the jury answered the second statutory question with eleven affirmative votes and one negative vote.

### Statutory Aggravating Circumstances

■ In Ortiz's case, the State alleged that the two applicable statutory aggravating circumstances were that: the defendant was previously convicted of a felony

**89.** Del.Code Ann. tit. 11, § 4209(e) (2002).

**90.** *Manley v. State,* 709 A.2d 643, 658 (Del. 1998). *Wright v. State,* 633 A.2d at 339 (quoting *Red Dog v. State,* 616 A.2d 298, 306–07 (Del.1992)) (certain citations and quotation marks omitted); *Gattis v. State,* 637 A.2d at 821; *Dawson v. State,* 637 A.2d at 66; *Sullivan v. State,* 636 A.2d at 949. *See generally Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

**91.** *Manley v. State,* 709 A.2d 643, 658 (Del. 1998).

**92.** *See id.*

**93.** Del.Code Ann. tit. 11, § 4209(c)(3)a.1 (2002).

**94.** *Manley v. State,* 709 A.2d at 658.

**95.** Del.Code Ann. tit. 11, § 4209(c)(3)a.2 (2002).

**96.** *See id.* § 4209(e)(1)i.

involving the use of, or threat of, force or violence upon another person;[97] and the murder was premeditated and the result of substantial planning.[98] The jury unanimously found beyond a reasonable doubt that Ortiz had previously been convicted of a felony involving force. By a 9–3 vote, the majority of the jury found that the murder was premeditated and the result of substantial planning.

The jury and trial judge concluded that the State's evidence established the existence of one statutory aggravating circumstance beyond a reasonable doubt. Although Ortiz has not challenged those findings and conclusions, we have carefully reviewed that alleged aggravating statutory circumstance.[99] There was no dispute at trial that Ortiz entered a guilty plea to Assault in the Second Degree, in 1994, as a result of an incident in which Ortiz admitted that he had struck Walter Mills in the face with his fist. There was also no dispute at trial that Ortiz pled guilty to Assault in the Second Degree as a result of having fractured his three-year-old son's collarbone in October 1996. On July 16, 1999, Ortiz entered a plea of guilty to Assault in the Second Degree again after an incident in which he hit Vincent Spicer while the two men were in prison. Accordingly, we hold that there was sufficient record evidence to support the jury's unanimous finding that the first alleged statutory aggravator was proven beyond a reasonable doubt.

### Non–Statutory Aggravating Circumstance

■■■　The Superior Court was satisfied that the State had proven by sufficient reliable evidence that premeditation and substantial planning were established by the State as a non-statutory aggravating factor because: Ortiz had used the pillows as a "home-made silencer," Ortiz lied to the victim's son that he did not have the guns when he indeed was in possession of the son's guns; and the fact that the murder happened only minutes after the victim arrived home that afternoon. The Superior Court also found, based upon the State's evidence, that the following additional non-statutory aggravating factors were established:

1. The victim was defenseless when she was murdered.

2. The murder of Deborah Clay had an adverse impact on her family.

3. In his statement to the police, the defendant stated that he set the fire to spare Ashley Clay from finding her mother in the mobile home. I find that he did so, however, in an attempt to destroy evidence of his crime. The destruction of the victim's residence, which was also the residence of Ashley, is a substantial aggravating factor.

4. The defendant was on probation at the time of the murder. This aggravating factor is given greater weight by the fact that he was on house arrest and murdered his house arrest host. This is a substantial aggravating factor.

5. The defendant has an extensive criminal record including felony and misdemeanor convictions and violations of probation. His criminal record establishes a history of assaultive behavior, as evidenced by his three felony convictions for assault in the second degree. He has a fourth felony conviction for unlawful sexual contact in the second degree. His convictions in this case make him an

**97.** Del.Code Ann. tit. 11, § 4209(e)(1)(i) (2002).

**98.** *See id.*

**99.** *Stevenson v. State,* 709 A.2d 619 (Del. 1998).

habitual criminal under 11 Del. C. § 4214. This is a substantial aggravating factor.

6. The defendant has a history of violation of prison rules. Many of these are minor, but some are significant, such as unauthorized possession of a razor, which could be used as a weapon.

7. The evidence established that the defendant, if provoked, is subject to intense rage during which he can become dangerous. As mentioned, his criminal history includes a history of assaultive behavior. For these reasons, I find that the defendant is potentially dangerous in the future.

### Mitigating Circumstances

The trial judge considered mitigating evidence presented by defense counsel.[100] The Superior Court found the following mitigating factors were established by the evidence: that Ortiz did express remorse for what he had done; Ortiz expressed concern for his mental and emotional problems and how they could hurt his family and asking for treatment; Ortiz suffered a disadvantaged childhood; Ortiz loves his family and his family loves him; he has children who love him; he has friends and acquaintances who could write, phone and visit him in prison; Ortiz performed prior good deeds and has shown a willingness to help others; he has shown some positive personality traits such as kindness; his death would cause emotional trauma to his family and friends; Ortiz has job skills and can address his problems in prison; he

could teach his job skills to other inmates; and he could become a productive member of prison society. The trial judge found that the mitigating factors relating to Ortiz's potential contributions to prison society are offset to a degree by his history of prison rule violations.

### Death Sentence Not Arbitrary or Capricious

■ After setting forth its analysis of the statutory and non-statutory aggravating circumstances, as well as the mitigating circumstances, the Superior Court weighed them. In Delaware, the procedure to be followed by trial judges "is not a mere counting process of X number of aggravating circumstances and Y number of mitigating circumstances, but rather a reasoned judgment as to what factual situations require the imposition of death and which can be satisfied by life imprisonment in light of the totality of the circumstances present."[101] In its sentencing decision, the Superior Court considered the statutory aggravating circumstances alleged by the State. It also carefully reviewed the non-statutory aggravating circumstances established by the State and the mitigating evidence presented by Ortiz.

The record reflects that the Superior Court carefully considered the totality of the evidence in aggravation and mitigation, which related to the particular circumstances of the murder of Deborah Clay, as well as to the character and propensities of Ortiz.[102] The record reflects that the Superior Court's decision to impose the death

---

**100.** Of that evidence, the trial judge held that only three factors were *not found* by a preponderance of the evidence. Those factors *not found* were: that Ortiz was acting under extreme emotional distress; that Ortiz did not understand the difference between right and wrong in connection with the murder of Deborah Clay; and that Ortiz cooperated with the police.

**101.** *State v. Cohen,* 604 A.2d 846, 849 (Del. 1992) (quoting *State v. Dixon,* 283 So.2d 1, 10 (Fla.1973)).

**102.** *See* Del.Code Ann. tit. 11, § 4209(g)(2)a. (2002); *Dawson v. State,* 637 A.2d 57, 67 (Del.1994); *Sullivan v. State,* 636 A.2d 931, 950 (Del.1994).

sentence was "the product of a deliberate, rational and logical deductive process."[103] After a careful review of the entire record, this Court concludes that the sentence of death was not imposed upon Ortiz by the Superior Court either arbitrarily or capriciously.[104]

### Proportionality Review

■ The final issue that this Court must analyze in its mandatory review is whether the Superior Court judge's imposition of the death penalty upon Ortiz was disproportionate to the penalty imposed in other cases arising under the Delaware death penalty statute.[105] In answering that inquiry, this Court has reviewed the "universe" of cases.[106] The "universe" of cases is comprised of those First Degree Murder cases which have included a penalty hearing and in which the sentence has become final, either without or following a review by this Court.[107] Section 4209 was amended in 1991 by Chapter 189 of Delaware Laws Volume 68. "Although the significant 1991 changes in the statutory scheme create a significant dissimilarity between the pre–1991 cases and the post–1991 cases in the universe, pre–1991 jury decisions are nevertheless 'pertinent' to our proportionality analysis."[108]

We have compared Ortiz's sentence with the penalties imposed in the universe of all First Degree Murder cases which have

included a death penalty hearing. We have also considered objective factors such as the gravity of the offense, the circumstances of the crime, and the severity of the penalty.[109] The manner of Deborah Clay's death was extremely brutal. The trial judge described Ortiz's crime as follows:

> After [Deborah Clay] stepped in the shower, the defendant positioned himself in the hallway facing the common wall between the hallway and the shower stall. He placed pillows, which he had rolled up and bound together with tape, on a washer and dryer which were immediately in front of him as he faced the wall. He then aimed and fired a slug from a 12–gage [sic] shotgun through the pillows and the wall, striking Deborah Clay in the abdomen as she stood in the shower.
>
> He then worked the bolt of the shotgun to prepare it for another shot, entered the bathroom or its doorway, and upon seeing Deborah Clay still alive, fired a second shot into the side of her head, causing her instant death.

Although pecuniary gain is a common feature, the death penalty has been upheld where that motive is absent.[110] Ortiz's case is similar to other cases where the victim was a current or former lover.[111] Ortiz's case represents another example of

**103.** *Red Dog v. State,* 616 A.2d 298, 310 (Del. 1992).

**104.** Del.Code Ann. tit. 11, § 4209(g)(2)a. (2002).

**105.** *Id.* § 4209(g)(2)a.

**106.** *See* Appendix A.

**107.** *Ferguson v. State,* 642 A.2d 772, 789 (Del. 1994).

**108.** *Lawrie v. State,* 643 A.2d 1336, 1350 (Del. 1994).

**109.** *See Red Dog v. State,* 616 A.2d 298, 311 (Del.1992).

**110.** *E.g., Gattis v. State,* 637 A.2d 808, 823 (Del.1994) (involving a deliberate, cold-blooded killing of an ex-girlfriend); *Pennell v. State,* 604 A.2d 1368, 1377–78 (Del.1992) (involving motiveless, deliberate murders preceded by torture).

**111.** *See Taylor v. State,* 822 A.2d 1052, 1058 (Del.2003); *Capano v. State,* 781 A.2d 556, 677 (Del.2001); *Weeks v. State,* 653 A.2d 266, 274 (Del.1995); *Gattis v. State,* 637 A.2d at 823; *but see Taylor v. State,* 685 A.2d 349 (Del.1996).

a senseless, unprovoked, cold-blooded execution-style killing of a defenseless individual, who was not only Ortiz's girlfriend but also his home confinement host.

"Sentencing decisions involve 'difficult and uniquely human judgments that defy codification and that buil[d] discretion, equity, and flexibility into a legal system.'"[112] This Court has consistently noted in prior cases involving proportionality review that "[a] definitive comparison of the 'universe' of cases is almost impossible."[113] This Court has concluded that the Superior Court judge's imposition of a sentence of death upon Ortiz was not disproportionate to the sentences imposed on other defendants in the relevant universe of cases involving death penalty hearings in Delaware.[114]

### Conclusion

This Court has carefully reviewed the entire record and has considered and rejected all claims of reversible error raised by Ortiz in this appeal. This Court has concluded that the death sentence for Ortiz was not imposed either arbitrarily or capriciously. This Court has also determined that Ortiz's death sentence is not disproportionate to the sentences imposed in other First Degree Murder cases that have proceeded to a penalty hearing pursuant to the Delaware death penalty statute. Accordingly, the underlying convictions and judgments of the Superior Court, including the sentence of death, are affirmed. The matter is remanded to the Superior Court for further proceedings consistent with this opinion. The Clerk of this Court is directed to cause a copy of this opinion to be delivered forthwith to the attorneys for the parties and to the Commissioner of the Department of Correction.

### APPENDIX A
#### Universe of Cases *

Name: Meri-Ya C. Baker
Criminal ID: 90011925DI
County: New Castle
Sentence: Life Imprisonment
Decision on appeal: 1993 WL 557951 (Dec. 30, 1993)

Name: Jermaine Barnett
Criminal ID: 9506017682
County: New Castle
Sentence: Life (following second penalty hearing)
Decision on appeal: 749 A.2d 1230 (2000) (remanding for new sentencing)

Name: Hector S. Barrow
Criminal ID: 9506017661
County: New Castle
Sentence: Life (following second penalty hearing)

112. *Wright v. State*, 633 A.2d 329, 342–43 (Del.1993) (quoting *McCleskey v. Kemp*, 481 U.S. 279, 311, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987) (citation omitted)).

113. *Red Dog v. State*, 616 A.2d at 311; *Dawson v. State*, 637 A.2d 57, 68 (Del.1994); *Sullivan v. State*, 636 A.2d 931, 950 (Del.1994).

114. Del.Code Ann. tit. 11, § 4209(g)(2)a (2002).

* The universe of cases prior to 1991 is set forth in appendices to prior opinions by this Court, and those appendices are incorporated herein by reference. *See, e.g., Lawrie v. State*, Del. Supr., 643 A.2d 1336, 1352–56 (1994).

## APPENDIX A

Decision on appeal: 749 A.2d 1230 (2000) (remanding for new sentencing)

Name:             Tyreek D. Brown
Criminal ID:       9705011492
County:           New Castle
Sentence:         Life Imprisonment
Decision on appeal: 1999 WL 485174 (Mar. 1, 1999)

Name:             Justin L. Burrell
Criminal ID:       9805012046
County:           Kent
Sentence:         Life Imprisonment
Decision on appeal: 766 A.2d 19 (2000)

Name:             Luis G. Cabrera
Criminal ID:       9703012700
County:           New Castle
Sentence:         Life Imprisonment
Decision on appeal: 747 A.2d 543 (2000)

Name:             Luis G. Cabrera
Criminal ID:       9904019326
County:           New Castle
Sentence:         Death
Decision on appeal: 840 A.2d 1256 (2004)

Name:             Thomas J. Capano
Criminal ID:       9711006198
County:           New Castle
Sentence:         Death
Decision on appeal: 781 A.2d 556 (2001)

Name:             James B. Clark, Jr.
Criminal ID:       9406003237
County:           New Castle
Sentence:         Death
Decision on appeal: 672 A.2d 1004 (1996)

Name:             Charles M. Cohen
Criminal ID:       90001577DI
County:           New Castle
Sentence:         Life Imprisonment
Decision on appeal: No direct appeal taken

Name:             James T. Crowe, Jr.
Criminal ID:       9508008979
County:           New Castle
Sentence:         Life Imprisonment
Decision on appeal: 1998 WL 736389 (Oct. 8, 1998)

Name:             David F. Dawson
Criminal ID:       88K00413DI
County:           New Castle (venue changed)
Sentence:         Death
Decision on appeal: 637 A.2d 57 (1994)

Name:             Curtis Demby
Criminal ID:       9412011308
County:           New Castle

## APPENDIX A

Sentence:           Life Imprisonment
Decision on appeal: 744 A.2d 976 (2000)

Name:               Byron S. Dickerson
Criminal ID:        90011926DI
County:             New Castle
Sentence:           Life Imprisonment
Decision on appeal: 1993 WL 541913 (Dec. 21, 1993)

Name:               Cornelius E. Ferguson
Criminal ID:        91009926DI
County:             New Castle
Sentence:           Death
Decision on appeal: 642 A.2d 772 (1994)

Name:               Donald Flagg
Criminal ID:        9804019233
County:             New Castle
Sentence:           Life Imprisonment
Decision on appeal: No direct appeal taken

Name:               Sadiki J. Garden
Criminal ID:        9912015068
County:             New Castle
Sentence:           Life sentence ordered by Delaware Supreme Court
Decision on appeal: 844 A.2d 311 (2004)

Name:               Robert A. Gattis
Criminal ID:        90004576DI
County:             New Castle
Sentence:           Death
Decision on appeal: 637 A.2d 808 (1994)

Name:               Arthur Govan
Criminal ID:        92010166DI
County:             New Castle
Sentence:           Life Imprisonment
Decision on appeal: 1995 WL 48359 (Jan. 30, 1995)

Name:               Robert W. Jackson, III
Criminal ID:        92003717
County:             New Castle
Sentence:           Death
Decision on appeal: 684 A.2d 745 (1996)

Name:               David Jones
Criminal ID:        9807016504
County:             New Castle
Sentence:           Life Imprisonment
Decision on appeal: 798 A.2d 1013 (2002)

Name:               Mark A. Kirk
Criminal ID:        9612002650
County:             New Castle
Sentence:           Life Imprisonment
Decision on appeal: 1999 WL 415802 (Apr. 29, 1999)

Name:               David J. Lawrie
Criminal ID:        92K03617DI

## APPENDIX A

County:               Kent
Sentence:             Death
Decision on appeal:   643 A.2d 1336 (1994)

Name:                 Thomas M. Magner
Criminal ID:          9509007746
County:               New Castle
Sentence:             Life Imprisonment
Decision on appeal:   1998 WL 666726 (July 29, 1998)

Name:                 Frank W. Moore, Jr.
Criminal ID:          92S03679DI
County:               Sussex
Sentence:             Life Imprisonment
Decision on appeal:   1994 WL 202289 (May 9, 1994)

Name:                 Adam Norcross
Criminal ID:          0002006278A
County:               Kent
Sentence:             Death
Decision on appeal:   816 A.2d 757 (2003)

Name:                 Jack F. Outten
Criminal ID:          92000786DI
County:               New Castle
Sentence:             Death
Decision on appeal:   650 A.2d 1291 (1994)

Name:                 James W. Perez
Criminal ID:          93001659
County:               New Castle
Sentence:             Life Imprisonment
Decision on appeal:   No. 207, 1993, Moore, J. (Feb. 3, 1994)

Name:                 Gary W. Ploof
Criminal ID:          0111003002
County:               Kent
Sentence:             Death
Decision on appeal:   856 A.2d 539 (2004)

Name:                 James Allen Red Dog
Criminal ID:          91001754DI
County:               New Castle
Sentence:             Death
Decision on appeal:   616 A.2d 298 (1992)

Name:                 Luis Reyes
Criminal ID:          9904019329
County:               New Castle
Sentence:             Death
Decision on appeal:   819 A.2d 305 (2003)

Name:                 James W. Riley
Criminal ID:          0004014504
County:               Kent
Sentence:             Life (following retrial)
Decision on appeal:   2004 WL 2085525 (Oct. 20, 2004)

Name:                 Jose Rodriguez

## APPENDIX A

| | |
|---|---|
| Criminal ID: | 93001668DI |
| County: | New Castle |
| Sentence: | Life Imprisonment |
| Decision on appeal: | 1994 WL 679731 (Nov. 29, 1994) |

| | |
|---|---|
| Name: | Richard Roth |
| Criminal ID: | 9901000330 |
| County: | New Castle |
| Sentence: | Life Imprisonment |
| Decision on appeal: | 788 A.2d 101 (2001) |

| | |
|---|---|
| Name: | Reginald N. Sanders |
| Criminal ID: | 91010161DI |
| County: | New Castle (venue changed) |
| Sentence: | Life Imprisonment (following 1992 resentencing) |
| Decision on appeal: | 585 A.2d 117 (1990) (remanding for new sentencing) |

| | |
|---|---|
| Name: | Nelson W. Shelton |
| Criminal ID: | 92000788DI |
| County: | New Castle |
| Sentence: | Death |
| Decision on appeal: | 652 A.2d 1 (1995) |

| | |
|---|---|
| Name: | Steven W. Shelton |
| Criminal ID: | 92000787DI |
| County: | New Castle |
| Sentence: | Death |
| Decision on appeal: | 650 A.2d 1291 (1994) |

| | |
|---|---|
| Name: | Donald J. Simmons |
| Criminal ID: | 92000305DI |
| County: | New Castle |
| Sentence: | Life Imprisonment |
| Decision on appeal: | No direct appeal taken |

| | |
|---|---|
| Name: | Brian David Steckel |
| Criminal ID: | 9409002147 |
| County: | New Castle |
| Sentence: | Death |
| Decision on appeal: | 711 A.2d 5 (1998) |

| | |
|---|---|
| Name: | Willie G. Sullivan |
| Criminal ID: | 92K00055 |
| County: | Kent |
| Sentence: | Death |
| Decision on appeal: | 636 A.2d 931 (1994) |

| | |
|---|---|
| Name: | Ralph Swan |
| Criminal ID: | 0002004767A |
| County: | Kent |
| Sentence: | Death |
| Decision on appeal: | 820 A.2d 342 (2003) |

| | |
|---|---|
| Name: | Antonio L. Taylor |
| Criminal ID: | 9404018838 |
| County: | Kent |
| Sentence: | Life Imprisonment |
| Decision on appeal: | 685 A.2d 349 (1996) |

## APPENDIX A

Name:                    Milton Taylor
Criminal ID:             0003016874
County:                  New Castle
Sentence:                Death
Decision on appeal:      822 A.2d 1052 (2003)

Name:                    Charles H. Trowbridge
Criminal ID:             91K03044DI
County:                  Kent
Sentence:                Life Imprisonment
Decision on appeal:      1996 WL 145788 (Mar. 4, 1996)

Name:                    James W. Virdin
Criminal ID:             9809015552
County:                  Kent
Sentence:                Life Imprisonment
Decision on appeal:      780 A.2d 1024 (2001)

Name:                    John E. Watson
Criminal ID:             91008490DI
County:                  New Castle
Sentence:                Life Imprisonment
Decision on appeal:      No direct appeal taken

Name:                    Dwayne Weeks
Criminal ID:             92010167
County:                  New Castle
Sentence:                Death
Decision on appeal:      653 A.2d 266 (1995)

Name:                    Joseph Williams
Criminal ID:             9809018249
County:                  New Castle
Sentence:                Life
Decision on appeal:      2003 WL 1740469 (Apr. 1, 2003)

Name:                    Roy R. Williamson
Criminal ID:             93S02210DI
County:                  Sussex
Sentence:                Life Imprisonment
Decision on appeal:      669 A.2d 95 (1995)

Name:                    Jermaine M. Wright
Criminal ID:             91004136
County:                  New Castle
Sentence:                Death
Decision on appeal:      671 A.2d 1353 (1996)

Name:                    Craig A. Zebroski
Criminal ID:             9604017809
County:                  New Castle
Sentence:                Death
Decision on appeal:      715 A.2d 75 (1998)

## APPENDIX B

*DEFENDANT'S PROPOSED SUPPLE-MENTAL QUESTIONNAIRE*

1. Please check the levels of education completed:

Grade School ____   Junior High ____
High School ____   Vocational/Trade School ____
College ____   Professional Schools ____
Graduate School ____

2. If a graduate of a college or vocational school, what was your major area of study or training? _____

3. Have you ever been self-employed? Yes ____ No ____

If yes, please describe when and what you did while self-employed: _____

4. List significant employment within the past 10 years. Give approximate dates. _____

5. Marital Status:
____ Never Married   ____ Married
____ Divorced   Number of Years ____
____ Separated   ____ Widowed

6. Number of Children (if any): ____ Girls ____ Boys

Ages: _____

7. Please list for each child 18 years or older:

| Age | Occupation | Place of Employment | City of Residence |
|-----|-----------|---------------------|-------------------|
|     |           |                     |                   |
|     |           |                     |                   |
|     |           |                     |                   |

8. Please list organization to which you or your spouse belong or in which either of you participate, either now or in the recent past. For example, religious, political, social, fraternal, service, professional, business, sporting, recreational organizations, and union membership.

_____

9. Any offices held in above organizations:

10. If you are affiliated with a church, temple, synagogue or other religious organization, please give its name and location: _____

11. Do you have an active role in your church? Yes ____ No ____

If yes, please explain:

_____

12. Have you ever studied for the ministry, priesthood or any other religious position? Yes ____ No ____

If so, please explain: _____

13. Have you or your spouse ever participated in, or contributed money to, any group concerned with crime prevention or victims' rights (such as Crime Stoppers, Neighborhood Watch Programs, Shelters or Crisis Centers?
Yes _____   No _____

If so, please describe:

_____

14. What newspapers and magazines do you usually read?

_____

15. List any National or Local News programs you frequently watch?

_____

16. If applicable, do you have one or more favorite radio stations? Yes ____ No ____

If so, which ones? _____

17. Do you frequently listen to any radio talk shows? Yes ____ No ____

If so, which ones? _____

18. Name three favorite television programs that you regularly watch?

_____

19. Please list the types of books or movies you most enjoy:

_____

20. Please list your hobbies or spare time activities:

_____

21. Have you ever owned any kind of firearm?  Yes ____ No ____

If so, what types of firearm(s) have you owned, and for what purposes do you (did you) own them?  _____

22. Have you ever belonged to the National Rifle Association, Gun Owners of America or any other organization which is concerned with protecting the right to own weapons?  Yes ____ No ____

If so, please describe the extent of your participation in the organization:  ____

23. Have you ever had bumper stickers on your car?  Yes ____ No ____

If so, what did the bumper sticker(s) say:  _____

24. Would you describe yourself politically?  Pick the spot on the scale which seems correct:

| 1 | 2 | 3 | 4 | 5 | 6 |
| Extremely liberal | | | | Extremely conservative | |

(check if applicable)

____ No overall classification fits in my case.

## APPENDIX C

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR KENT COUNTY

STATE OF DELAWARE

v.

JUAN J. ORTIZ, JR., Defendant.

Cr. A. No. IK01–07–0438, et al.

### VOIR DIRE QUESTIONS

#### Preliminary Comments

Ladies and gentlemen, we are about to begin the selection of a jury for the trial of criminal charges in the case of *State of Delaware v. Juan Ortiz, Jr.* If you cannot hear me at any point during these preliminary comments or preliminary questions which will be asked, please indicate so by raising your hand.

This is a criminal case in which the defendant, Juan Ortiz, Jr., is charged with the following crimes by indictment of the Grand Jury:

Count 1—Murder in the First Degree

Count 2—Possession of a Deadly Weapon During the Commission of a Felony.

Count 3—Arson in the First Degree

The offenses are alleged to have occurred on or about July 6, 2001, in Kent County, Delaware.  The case involves the death of Deborah Clay in a residence on Still Pond Circle near Harrington, Delaware.  Among other things, the State alleges that on or about July 6, 2001, the defendant, Juan Ortiz, Jr., intentionally caused the death of Deborah Clay by means of a shotgun.

I am James T. Vaughn, Jr., a Resident Judge of the Superior Court of the State of Delaware and I will be presiding over this case.  The prosecuting attorneys for the State in this case are Stephen R. Welch, Esquire and James Kriner, Esquire, of the Department of Justice.  The attorneys representing the defendant are Lloyd A. Schmid, Jr., Esquire, and Deborah L. Carey, Esquire.

Each of you is a prospective juror in this case.  During the jury selection process, you are not to discuss this case with anyone except with me in response to my questions, nor are you to read or listen to any accounts or discussions of the case reported in the news media, whether newspaper, radio or television.

I am now going to be asking all of you some questions for the purpose of deter-

mining if your decision in this case will be influenced in any way by some personal experience or special knowledge or opinion that you might have. Later, I will be questioning you individually until a jury is selected. The object of this procedure, called *voir dire*, is to obtain a jury which will impartially try the issues in this case upon the evidence presented at the trial without being influenced by any other factors. It will be the function of the jury after weighing and considering all of the evidence and the applicable law to determine whether the defendant is guilty of the crimes charged, guilty of any lesser-included offense that may be applicable, or not guilty.

The law provides that any person who is convicted of Murder in the First Degree shall be punished by death or by imprisonment for the remainder of his life without benefit of probation or parole or any other reduction of sentence. If a person is found guilty of Murder in the First Degree, there is a separate hearing on the issue of punishment before the same jury. At the hearing, the State may introduce evidence in support of certain aggravating circumstances which it contends exist in the case. The defense may introduce evidence in support of certain mitigating circumstances which it contends exist in the case. It will be the function of the jury, after weighing and considering all of the evidence and applicable law, to report to the Court answers to the following questions: (1) whether the evidence shows beyond a reasonable doubt the existence of at least one statutory aggravating circumstance and (2) whether, by a preponderance of evidence, after weighing all relevant evidence in aggravation or mitigation which bears upon the particular circumstances or details of the commission of the offense and the character and propensities of the offender, the aggravating circumstances found to exist outweigh the mitigating circumstances found to exist.

The jury shall report to the Court its finding on the question of the existence of statutory aggravating circumstances. In order to find the existence of a statutory aggravating circumstance beyond a reasonable doubt, the jury must be unanimous as to the existence of that statutory circumstance. As to any statutory aggravating circumstances which were alleged but for which the jury is not unanimous, the jury shall report the number of the affirmative and negative votes on each such circumstance. In the event that the jury does not unanimously find the existence of any statutory aggravating circumstance beyond a reasonable doubt, the defendant shall be sentenced by the Court to life imprisonment without the benefit of probation or parole or any other reduction of sentence. In the event that the jury does unanimously find beyond a reasonable doubt the existence of at least one statutory aggravating circumstance, the defendant shall be eligible for the death penalty; and the jury will then also report to the Court by the number of affirmative and negative votes its answer on the question as to whether the aggravating circumstances found to exist outweigh the mitigating circumstances found to exist. The Court will view the answer to this last question as a recommendation. The law does not require a unanimous determination by the jury in a capital case as to its sentencing recommendation. If the defendant is eligible for the death penalty, the Court will make the final determination of what sentence to impose for the crime of Murder in the First Degree after considering the recommendation of the jury. While the Court is not bound by your recommendation, you should bear in mind that the jury's recommendation will be giv-

en great weight by the Court in its final determination of the appropriate sentence in this case.

During my individual questioning. I will be asking you certain questions concerning your opinions about the death penalty. I will also be asking you certain questions concerning your ability to consider and recommend such a penalty in this case if you find that punishment appropriate. I will also be asking you certain questions regarding your ability to consider and recommend a life sentence without release, if you find that punishment appropriate in the case. In addition, you will be asked questions concerning your ability to follow the law applicable to the determination of punishment in other respects. Since the death penalty and your ability to consider it in a particular case are issues which you may not have been required to consider seriously in the past, I suggest that you give those issues some thought before I begin the individual questioning of prospective jurors.

You should understand that this questioning process is not for the purpose of prying into your affairs, but rather is only for the purpose of determining if you can be an impartial juror. You should also understand that neither my comments nor the questions I will ask are meant to suggest what your verdict should be in the guilt phase, or what your sentencing recommendation should be if a penalty hearing should be necessary.

The jury will decide the proper verdict based on the evidence presented in the trial, and if necessary, will also decide the proper sentencing recommendation in light of the facts and circumstances of the case.

The first several questions will be asked to you as a group and a copy has been provided to you. It is extremely important that you give your undivided attention to me while these questions are being asked. After these questions are asked, you will be informed of your group assignment and reporting time for individual questioning by me. When I talk to you individually I will first ask you if your answer was "yes" to any of the preliminary questions.

### Preliminary Questions

I will now ask the preliminary questions.

(1) We estimate that the trial of this case may take four to six weeks, starting on July 14. Is there any reason why you cannot serve during this period?

(2) Would you have any difficulty serving if the jury were sequestered, that is, restricted from going home in the evenings? Sequestration would only occur at the conclusion of the case during deliberations, or if the Court determines during the trial that there is some compelling reason to do so. During jury deliberations, contact with any outside person, including members of your family, will be restricted. Would you have any difficulty in complying with this procedure?

(3) Do you know anything about this case through personal knowledge, discussion with anyone, the news media or any other source?

(4) Do you or any member of your immediate family know the defendant, Juan Ortiz, Jr., or the alleged victim of the case, Deborah Clay, or any of their friends, relatives or co-workers?

(5) Do you know the attorneys in this case or any attorney or employee in the Office of the Attorney General or defense counsel?

(6) Do you know me, personally or anyone in my immediate family?

(7) Do you know any of the following persons who might be called as witnesses?

Tonya Russell
Janet Daniels
Juan Ortiz, Sr.
Stacy Bankowski
Stacy Wilson
Ron Drake
Katherine Coughlin
Mary Shirey
Robert Cox
Crystal Cox
Edward Marecki
Toby Sitler
Jimmy Moxley
Tony Consalo
Kevin Sipple
Curt Crowder
Robert Hudson
Robert Hawkins
Joseph Huttie
Shawn Nowrey
Randy Fisher
Kevin Mack
John Turner
Keith Marvel
Gary Cicchini
Matt Fuski
Jon Wood
Jay Burns
Andrel Martiznez
Ella Smith
Delores Ball
Mary Ortiz
Janet Daniels
Keith Daniels
Maria Ramos
Larry Chapman
Patsy Andrews
Carol Coggins
Bd Kunes
Becky Kunes
Donna Leach
Crystal Ortiz
Tonya Mosley
Crystal Donze
Dr. Abe Mensch
Jodine Donovan
Judy Herr
Sherri Truitt
Ray Warncke
John Warncke
Frederick Baal
Jerry Conley
Rachel Griffith
James Stanton

Larry Chapman
Walter Mills
Heather Ballard
Theresa Ballard
Vincent Spicer
Ashley Clay
Amy Rust
Brock Pritchett
Michael Clay
Mike Ratledge
John Sebastian
Donna McGee
Dan McLaughlin
J.D. Dennis
Gary Harrington
Scott Garland
Charles Mullett
Joseph Masson
Tim Valeski
Scott McCarthy
Daniel Katz
Dr. Adrienne Sekula Perlman
Robert Carlson
Richard Ward
Scott Bullock
James Cubbage
William Billings
Kathleen Brittingham
Michael Chionchio
James Endres
Bill Wilkins
Patricia Gallagher
Margaret Collison
James Kowalski
Mary Favata (a/k/a Mary Chapman)
Donna Young
Dr. Mitchell Kho
Linda Zervas
Jack Ingle
Juan Shirey
Jessica Shirey
Dr. Michael Weiss
Teri Lawton
Tanya Mosley
Lisa Raines
Susan Borntrieger (a/k/a Susan Maine)
Frank Krompka
Paul Unsworth
Darren Stevens
Robert Truitt
Karen Ratledge
Steven Wus
Michael Mercer

Dale Breeding
Jenny Nelson
Neil Gallagher
Jerry Russell
Ronald Norvell
Cindy Swain
Robert Borkowski
Jill Winterling
Ruth Ann Coulson
Wayne Collison
Bruce Beene
Walter Dandrige
Mike Nichols
Dave Weaver
William Sipple
Debbie Wooters
Rebecca McBride
William Bush

(8) Do you have any bias or prejudice either for or against the State or the defendant that would make it difficult to render a fair decision in this case?

(9) Is there any reason why you cannot give this case your undivided attention and render a fair and impartial verdict?

If you have a "yes" answer to any of the questions that I have just asked, you will be requested to bring this to my attention during individual questioning.

So that we can limit inconvenience to you and to make it more manageable for the attorneys and the Court, we are now going to begin the process of dividing the jury panel into groups of 8. These groupings will be given a specific date and time to report back to the Court beginning today until the jury is selected. We will write the groupings on a flip chart so that you can refer to it in the event you forget your assigned date and time.

That concludes this phase of the questioning, and we will now select the groups. Please remain seated and listen for your number as well as the date and time you will be required to return to court.

### [GROUP SELECTIONS]

That concludes the group selections, and I now want to make several comments before I allow those of you with later reporting times to leave.

(1) Please arrive promptly on your assigned date and time. You will not get any additional notice of this schedule and you are required by order of the Court to be present.

(2) Should anyone attempt to discuss this case with you, you should immediately notify me or the bailiff. If this occurs, do not discuss what you heard with any other

potential juror and speak only to me or the bailiff.

(3) You are not to read or listen to any accounts or discussions of this case reported by the newspaper or by TV or radio. You must be very careful about this since the court expects extensive media coverage of this case. I would request that you take special precautions to avoid exposure to media accounts of this case, such as having another person review the paper for articles about the case and then avoid those sections without discussing them.

Please understand that the Court and the parties will be doing their best to adhere to the schedule. Occasionally, delays occur which cannot be foreseen. Therefore, you should contact the jury information line after 5:00 p.m. on the evening before you are scheduled to report.

### QUESTIONS TO INDIVIDUAL JURORS

#### (Juror Sworn)

(1) Was your answer "yes" to any of the preliminary questions asked earlier?

(2) Is there any reason why you cannot give this case your undivided attention?

(3) Are you a resident of Kent County?

### STATUTORY QUESTION— 11 DEL. C. § 3301

(4) Have you formed or expressed any opinion in regard to the guilt or innocence of the defendant? (11 *Del. C.* § 3301).

(If your answer is "yes" then: notwithstanding such an opinion, do you feel able to render an impartial verdict based solely upon the law and evidence presented at trial?)

(5) Have you read or heard anything concerning this case through the news media (including but not limited to television, radio and newspaper), personal knowledge,

discussions with other persons or any other source? (If "yes", then:)

(a) When did you read or hear about this case?

(b) What do you recall having heard or read about this case?

(c) Did you discuss with anyone else what you read or heard about this case?

(i) If so, what did you discuss?

(ii) If so, with whom did you discuss it?

(iii) If so, when did this discussion take place?

(d) Have you formed an opinion as to the guilt or innocence of the defendant as a result of what you read or heard through the news media or discussed with anyone else?

(e) Have you formed any opinion as to what the sentence should be in this case, in the event of a conviction, as a result of what you read or heard through the news media or discussed with anyone else?

(f) Would anything that you read or heard about this case through the news media or elsewhere make it difficult for you to render a fair and impartial decision in this case based solely upon the evidence introduced at trial and the instructions given to you by the Court?

(6). Have you read or heard anything concerning this case since you arrived at the Courthouse today, other than what you have heard from me in open court? (If "yes," then)

(a) What did you read or hear about the case?

(b) From whom did you hear it?

### DEATH PENALTY QUESTIONS

(7) Have you formed or expressed an opinion concerning whether or not the defendant in this case should be given the death penalty? (If "yes", ask the following questions:)

(a) What is the opinion that you have formed concerning whether or not the defendant in this case should be given the death penalty?

(b) If a penalty hearing is necessary, would you set aside any opinion you may now have and determine the defendant's sentencing recommendation solely on the evidence introduced during the penalty hearing and the instructions of law given to you by the Court?

(8) Do you have any religious, conscientious or other opposition to the death penalty? (If the response is in the affirmative, continue to question 6(a), 6(b), 6(c) and 6(d). If the response is in the negative, go on to question 7).

(a) Would your opinion, beliefs or opposition to the death penalty prevent or substantially impair the performance of your duties as a juror to decide the facts impartially in accordance with your oath?

(b) Would your opinion, beliefs or opposition to the death penalty prevent or substantially impair the performance of your duties as a juror to conscientiously apply the law as charged by the Court in accordance with your oath?

(c) Would you be able to recommend a sentence of death if the law and evidence so indicates, regardless of your feelings regarding the death penalty?

(d) In spite of your opinions and beliefs regarding the death penalty, could you nevertheless render a verdict of guilty if the evidence so warrants, knowing that such a finding will subject the defendant to the possibility of a death sentence?

(9) Do you believe that the death penalty is the only appropriate punishment in

every First Degree Murder case? If "yes", would that opinion impair your ability to recommend a life sentence without the possibility of probation or parole if the law and the evidence indicate that to be proper?

(10) Do you believe that a life sentence is the only appropriate punishment in every First Degree Murder case? If "yes", would that opinion impair your ability to recommend a death sentence if the law and the evidence indicate that to be proper?

(11) Do you believe that anyone who was convicted of Murder in the First Degree should automatically be given the death penalty regardless of the presence of any mitigating circumstances and regardless of the Court's instructions on the law?

(12) Do you believe that anyone who was convicted of Murder in the First Degree should automatically be given a life sentence regardless of the presence of any aggravating circumstances and regardless of the Court's instructions on the law?

(13) If you find the defendant guilty of Murder First Degree would you automatically vote in favor of a sentence of death regardless of the facts or the Court's instructions on the law?

(14) Would you automatically vote in favor of a life sentence regardless of the facts or the Court's instructions on the law?

(15) Would you be able, regardless of your feelings about the death penalty, to recommend a sentence of death if the law and the evidence so warrant?

(16) Would you be able, regardless of your feelings about the death penalty, to recommend a sentence of life imprisonment without the benefit of probation, pa-role or any other reduction if the law and the evidence so warrant?

(17) Would you be able, regardless of your feelings about the death penalty, to find the defendant guilty if the law and the evidence so warrant?

(18) Would you be able, regardless of your feelings about the death penalty, to find the defendant not guilty if the law and the evidence so warrant?

(19) Would you be able to answer the questions concerning sentence fairly and impartially and base your decision solely on the evidence you hear in this case?

## OTHER QUESTIONS

(20) Have you, a relative, or close friend ever been associated with a law enforcement agency, including the Attorney General's Office? If "yes" would that bias or prejudice you either for or against the State or the defendant?

(21) Have you, a relative or close friend ever been involved in treating or supporting victims of violent crimes? If "yes", would that bias or prejudice you either for or against the State or the defendant?

(22) The alleged crimes in question allegedly occurred at 58 Still Pond Circle north of Harrington, Delaware. Are you familiar with that area, or have you, a relative, or a close friend ever been a resident of that area?

(23) Have you, since the date of the incident in question, gone to the scene of the alleged crime on Still Pond Road.

(24) Have you or a close friend or relative been a victim of or a witness to a violent crime? The term "violent crime" includes any crime involving physical violence, the use of a weapon, physical threats or intimidation, or any sexual assault. (If "yes", then):

(a) Where, when and what type of crime?

(b) Were you interviewed by a member of any law enforcement agency?

(c) Was there a prosecution of the offense?

(d) What was the result?

(e) Were you satisfied that a just result was achieved?

(25) Have you or a close friend or relative ever been charged with committing a crime of violence or any felony? (If yes, then):

(a) Where, when and what type of crime?

(b) Were you interviewed by a member of any law enforcement agency?

(c) Was there a prosecution of the offense?

(d) What was the result?

(e) Were you satisfied that a just result was achieved?

(26) Are there any criminal charges pending against you, a relative or close friend for a violation of any state or federal law?

(27) Are you, a close friend or relative, presently under investigation or suspicion by any law enforcement agency for any criminal offense?

(28) Do you have any physical or mental disability that would affect your ability to render satisfactory jury service, including but not limited to a sight problem not corrected by glasses or other means or a hearing issue or any other health problem that would make it difficult for you to sit in a jury box for an extended period of time?

(29) Would the use of any substance on your part, such as alcohol or drugs, impair your ability to perform your duties as a juror?

(30) Would you weigh the testimony of a police officer differently than that of another witness merely because he or she was a police officer? (If "yes": Is that a result of his/her training or experience or based solely on the fact that he/she is a police officer?)

(31) Would you be able to listen with an open mind to all the people who speak from the witness stand?

(32) Have you ever been a juror in a criminal or civil case?

(a) What type of case was it?

(b) Was there anything about that experience that would cause you hesitancy in serving as a juror in the case?

(33) The defendant has no obligation to prove his innocence or even to testify. The defendant has a right to remain silent and not testify in his trial. A juror cannot consider that fact in determining whether the State has proven an element or an offense against him. Would the fact that the defendant might elect not to testify in his trial affect your ability to render a fair and impartial verdict based solely upon the evidence presented and the law as you shall be instructed?

(34) You will be instructed by the Court that the indictment against the defendant is a mere accusation, that the defendant is presumed innocent, and that the State has the burden of proving the defendant's guilt beyond a reasonable doubt. Do you believe you would have any difficulty following these instructions.

(35) Do you believe that since the defendant has been indicted, he must be guilty?

(36) Do you believe you could follow the Court's instructions regarding the law to apply, whether you agree with that law or not?

(37) The alleged victim of these offenses is a white female. The defendant is a

■■■■■■■■■■■■■  ■■■■■■■■■■■■

Puerto Rican male. Do you have any prejudice, however slight, based on the race or ethnicity of the alleged victim or the defendant which may affect your ability to render a fair and impartial verdict?

(38) It is anticipated that the State will present evidence concerning a gun that was allegedly used in the alleged offense. Do you have an opinion about possession of a firearm that would make it difficult for you to render a fair and impartial verdict in this case.?

(39) It is expected that you will see photographs of the victim's body depicting in great detail the wounds suffered, as well as the results of an autopsy subsequently performed. Would exposure to such photographs make it difficult for you to render a fair and impartial verdict?

(40) If the evidence were to show that the alleged victim in this case suffered a shotgun wound to the abdomen and a shotgun wound to the head which caused substantial disfigurement, would that evidence so repulse or inflame you that you would be unable to decide the case objectively and render a verdict based on the evidence and the law?

(41) Without being influenced by sympathy, vengeance, fear, favor, emotion or bias of any kind, would you be able to render a verdict? Would that be true even if there were the possibility of later public criticism or public approval of the verdict?

(42) If a child or other relative of the alleged victim or the defendant were to testify and become emotional while doing so, would that affect your ability to render a fair and impartial verdict.

(43) The State may present evidence of DNA or other scientific testing conducted in this case. Do you have any belief about the accuracy or inaccuracy of scientific testing and its results that would interfere with your ability to fairly and impartially consider such evidence?

(44) If it were established by competent evidence that the defendant had engaged in prior criminal behavior not related to the charged offenses; would that make it difficult for you to listen to the evidence concerning this case and render a decision based solely on the evidence presented in this case?

(45) During jury deliberations, if you come to a conclusion which puts you in the minority, would you change your verdict solely because you were in the minority?

(46) Is there any reason why you believe you should not be seated as a juror in this case?

(47) If the facts and circumstances as established by the evidence permit:

(a) could you find a verdict of guilty?

(b) could you find a verdict of not guilty?

(c) could you vote to impose the death penalty?

(d) could you vote to impose a sentence of life in prison without the possibility of release?

(48) Do you have any questions or concerns that you would like to raise at this point?